IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES, | : | CRIMINAL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GENE BORTNICK, | : | NO. 03-CR-0414 |
| Defendant. | : | |

MEMORANDUM

LEGROME D. DAVIS, J.                                                    JULY 20, 2005

Presently before the Court are the following post-trial motions filed by Defendant Gene

Bortnick ("Defendant"): the Renewed Motion to Dismiss Count One of the Indictment for

Failure to State a Criminal Offense Pursuant to Federal Rule of Criminal Procedure 12(b) and, in

the Alternative, for Judgment of Acquittal on Count One Pursuant to Federal Rule of Criminal

Procedure 29(a-c) due to the Government's Failure to Allege or Prove that Alleged Bank Fraud

Victim was FDIC Insured (Doc. No. 312); the Renewed Motion for Judgment of Acquittal on

Counts Two Through Eighteen Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc.

No. 308); the Renewed Motion for Judgment of Acquittal on Counts One through Eighteen

Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 324); the Renewed Motion for

Judgment of Acquittal on Counts Twenty-Six and Twenty-Seven Pursuant to Federal Rule of

Criminal Procedure 29(a-c) (Doc. No. 323); the Renewed Motion for Judgment of Acquittal as to

Count Nineteen Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 318); the

Renewed Motion for Judgment of Acquittal as to Count Twenty-One Pursuant to Federal Rule of

Criminal Procedure 29(a-c) (Doc. No. 319); the Renewed Motion for Judgment of Acquittal as to

Count Twenty-Two Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 322); the

Renewed Motion for Judgment of Acquittal as to Count Twenty-Three Pursuant to Federal Rule

of Criminal Procedure 29(a-c) (Doc. No. 320); the Renewed Motion for Judgment of Acquittal

as to Count Twenty-Four (Doc. No. 321); the Renewed Motion for Judgment of Acquittal as to

Count Twenty-Five Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 317);

Motion for Acquittal on Forfeiture Verdict Pursuant to Federal Rule of Criminal Procedure 29(c)

(Doc. No. 325); and the Motion for New Trial Pursuant to Federal Rules of Criminal Procedure

29(a-d) and 33 (Doc. No. 326).

Defendant was the owner and operator of three companies – MGL Apparel, Lorianna

Stores ("Lorianna"), and MGL Corporation ("MGL"), all of which operated out of an office

complex in Trevose, Pennsylvania.  Through these businesses, Defendant produced and sold

ladies' professional apparel.  Each company was part of Defendant's vertically-integrated

enterprise, with MGL purchasing fiber and fabric from overseas, MGL Apparel manufacturing

these raw materials into finished garments, and Lorianna selling the finished goods through retail

stores located throughout the country.  In September of 1998, Defendant secured $13 million in

asset-based financing from Congress Financial Corporation ("Congress") with the intent to use

the line of credit to aggressively expand his business operations.  According to the Loan

Agreement between Defendant and Congress, the asset underlying the loan was the inventory of

MGL Apparel, Lorianna, and MGL.  The criminal charges brought against Defendant all stem

from his activities after the receipt of this initial $13 million in financing.

The Third Superceding Indictment ("Indictment") delineated an overarching scheme of

fraud designed to increase the amount of financing extended to Defendant and his companies.

See generally, Third Superceding Indictment dated 12/2/04 (Doc. No. 124).  Under the Loan

Agreement, Defendant was required to periodically report to Congress the inventory held by this

three companies that was eligible to serve as a basis for the loan.  Gov't Ex. CF002 at 24-25.  In

order to satisfy the reporting requirements, Defendant submitted Inventory Certification Reports ("IRCs"), which detailed the total amount of inventory held by the borrowing companies for a given period.  See CF100 - CF116.  According to the Indictment, Defendant deliberately overstated the amount of inventory held by his companies on the seventeen IRCs that he submitted to Congress from December 31, 1998 until December 20, 1999.  The scheme to defraud not only included the submission of the false IRCs, but also the misleading of auditors and other third-parties working at the behest of Congress to determine the true state of the companies' finances, the submission of fraudulent bankruptcy filings on behalf of his three companies, the formation of three new, corresponding companies to replace the bankrupted entities, and the concealment of assets and inventory of the three bankrupted companies to entities related and unrelated to Defendant.  The Indictment further alleges that the Defendant used the proceeds of the bank and wire fraud to purchase a home in Hollywood, Florida.

After a four week trial and a week of deliberations, a jury convicted Defendant of one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Count One), seventeen counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two through Eighteen), and two counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2 (Counts Twenty-Six and Twenty Seven).  While the basis for the bank fraud conviction was the overarching scheme of fraud described above, the basis for the wire fraud charges was the seventeen individual IRCs faxed to Congress from December of 1998 until December of 1999, which the government argued contained fraudulently inflated inventory amounts for the three companies.[1]  The money

---

[1]	The IRCs at issue are dated December 31, 1998 (Count Two); April 8, 1999 (Count Three); April 16, 1999 (Count Four); April 22, 1999 (Count Five); May 14, 1999 (Count Six); May 28, 1999 (Count Seven); June 17, 1999 (Count Eight); June 30, 1999 (Count Nine); July 22, 1999 (Count Ten); August 30, 1999 (Count Eleven); September 22, 1999 (Count Twelve); October 13, 1999 (Count Thirteen); October 21, 1999 (Count Fourteen); November 3, 1999 (Count Fifteen); November 26, 1999 (Count Sixteen); December 14, 1999 (Count Seventeen); December 20, 1999 (Count Eighteen).  Third Superceding Indictment, Counts Two through Eighteen; Gov't Ex. CF-100-CF-116.

3

laundering charges stemmed from Defendant's alleged use of the loan proceeds to purchase the aforementioned house in Hollywood, Florida.

In addition, the jury found Defendant guilty of one count of transferring or concealing property in anticipation of bankruptcy in violation of 18 U.S.C. §§ 152(7) and 2 (Count Nineteen), four counts of making a false claim in bankruptcy in violation of 18 U.S.C. §§ 152(3) and 2 (Counts Twenty-One through Twenty-Four), and one count of concealing the property of a debtor in violation of 18 U.S.C. §§ 152(1) and 2 (Count Twenty-Five).  These counts stem from the Defendant's actions prior to or during the bankruptcy proceedings, which commenced when the three borrowing companies filed bankruptcy petitions on January 20, 2000 and the corresponding schedules and statements of financial affairs on February 4, 2000.  Gov't Exs. JC 1(b), 1(c), 2(b), 2(c), 3(b), 3(c).  The jury specifically found that Defendant: transferred over $1 million in fabric from MGL to UNICOM AP Chemical Corporation ("UNICOM") one month prior to filing for bankruptcy (Count Nineteen); included an inflated amount of inventory on the bankruptcy Schedule B for MGL (Count Twenty-One); failed to disclose payments to UNICOM, including the transfers of fabric underlying Count Nineteen, on the bankruptcy Statement of Financial Affairs for MGL (Count Twenty-Two); included an inflated amount of inventory and four inflated payables on the bankruptcy schedules of MGL Apparel (Count Twenty-Three); included an inflated amount of inventory on the bankruptcy Schedule B for Lorianna (Count Twenty-Four); and fraudulently concealed $135,042 from the estate of debt MGL by directing its transfer to third-party NTMS through the Bank of Cyprus (Count Twenty-Five).

Defendant moves for a judgment of acquittal on all counts based on the government's failure to present sufficient evidence at trial to sustain the above convictions.  Defendant also challenges several of his convictions on purely legal grounds.  The Court's thorough review of

Defendant's arguments, the trial transcripts, the evidentiary record, and the applicable case law reveals Defendant's challenges to be without merit.  For all the reasons that follow, Defendant's Motions are denied in their totality.

## I.      STANDARD OF LAW

All of Defendant's post-trial motions are brought pursuant to Federal Rule of Criminal Procedure 29.  The motion attacking the jurisdictional basis for Count One is also brought pursuant to Federal Rule of Criminal Procedure 12(b).

### A.      Dismissal for Failure to State a Criminal Offense

Defendant challenges Count One of the Indictment for failure to state a criminal offense. Under Rule 7(c)(1) of the Federal Rules of Criminal Procedure, an indictment is required to contain the provision of law that the defendant is alleged to have violated and "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The indictment must include all of the elements of the crime alleged as well as specific facts that satisfy all those elements; a recitation "in general terms the essential elements of the offense" is insufficient.  United States v. Spinner, 180 F.3d 514 (3d Cir. 1999); United States v. Panarella, 277 F.3d 678, 684-85 (3d Cir. 2002).  Moreover, a district court may review the facts in the indictment to see whether, as a matter of law, they reflect a proper interpretation of criminal activity under the relevant criminal statute. Panarella, 277 F.3d at 684-85.  A district court considering a motion to dismiss an indictment must accept as true all factual allegations set forth in the indictment.  United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990).

### B.      Judgment of Acquittal

Federal Rule of Criminal Procedure 29 mandates that a district court, upon the motion of a defendant or upon its own motion, shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed. R. Crim. P. 29(a).  A district court considering such a motion must determine "whether, after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

(1979); United States v. Coleman, 862 F.2d 455, 460-61 (3d Cir.1988).  In addition to being

viewed in the light most favorable to the government, the evidence in the record must be

examined as a whole.  United States v. Patrick, 985 F. Supp. 543, 548 (E.D. Pa. 1997).  "The

government must be given the benefit of inferences that may be drawn from the evidence and the

evidence may be considered probative even if it is circumstantial." Id.; see also United States v.

Griffith, 17 F.3d 865, 872 (3d Cir. 1994) ("It has long been recognized . . . that circumstantial

evidence . . . can be sufficient to support a jury's determination.").  Where the government has

presented sufficient circumstantial evidence to sustain a conviction, a court must do so, "even

where the evidence does not exclude other reasonable hypotheses that show the defendant's

innocence."  United States v. Heavrin, 144 F. Supp. 769, 773 (W.D. Ky. 2001) (citing United

States v. Beddow, 957 F.2d 1330, 1334 (6th Cir 1992)).

     A trial court analyzing the sufficiency of the evidence must exercise caution not to

trample upon functions that reside exclusively within the province of the jury.  As the Third

Circuit has stated, "It is not for us to weigh the evidence or to determine the credibility of the

witnesses." United States v. Schoolcraft, 879 F.2d 64, 69 (3d Cir.) (internal citations and

quotation marks omitted), cert. denied, 493 U.S. 995 (1989).  A court is bound to presume that

the jury properly evaluated credibility of the witnesses, found the facts, and drew rational

inferences.  United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).  A court's sole charge

in reviewing a Rule 29 motion is to evaluate, given the evidence presented at trial, whether a

reasonable jury could have found the essential elements of the crime.

     The timing of the defendant's motion also may limit which evidence a court must

evaluate in deciding a Rule 29 motion.  Where a motion for judgment of acquittal is made at the

end of the government's case and the Court reserves ruling on that motion, the Court may only

consider the motion on the basis of the evidence that had been presented at the time the motion

was tendered. 2a Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 462

(3d ed. 2000).  More simply stated, in evaluating such a motion, the Court may only review the

evidence presented during the government's case-in-chief.

## II.     JURISDICTIONAL ELEMENTS OF BANK AND WIRE FRAUD IN VIOLATION OF 18 U.S.C. §§ 1343, 1344.

The jury convicted Defendant of one count of bank fraud in violation of 18 U.S.C. §
1344, on the basis of the testimony and evidence presented at trial with respect to the
Defendant's course of conduct after his receipt of the financing from Congress and up to and
throughout the bankruptcy proceedings.  The jury also convicted Defendant of seventeen counts
of wire fraud in violation of 18 U.S.C. § 1343, on the basis of the government's allegations that
Defendant transmitted to Congress, over state lines, seventeen IRCs containing fraudulently
inflated inventory amounts designed to induce Congress into extending the Defendant's
companies additional financing.

Defendant challenges both of these convictions on jurisdictional and substantive grounds;
this section will address only his jurisdictional challenges, which are as follows. Defendant
argues that his conviction for bank fraud cannot stand because (1) the Indictment fails to state a
criminal offense, because it does not allege that he defrauded a financial institution, as statutorily
defined; (2) even if the Indictment is not fatally flawed, the government failed to present
sufficient evidence at trial that he defrauded a financial institution.  With respect to the wire
fraud convictions, Defendant argues that they cannot stand because the government failed to
offer any evidence at trial that the communications at issue in Counts Two through Eighteen
were faxed across state lines and that the wire transmissions at issue in Counts Eleven through
Eighteen were faxed at all.

A.     The Third Superceding Indictment Properly Charges Defendant with Bank Fraud

The bank fraud statute, 18 U.S.C. § 1344, states, in relevant part, that
(a)  Whoever knowingly executes, or attempts to execute, a scheme or artifice –
(1)  to defraud a financial institution; or
(2)  to obtain any of the moneys, funds, credits, assets, securities, or other
     property owned by, or under the custody or control of, a financial institution,
     by means of false or fraudulent pretenses, representations, or promises, [shall
     be guilty of an offense against the United States].

18 U.S.C. § 1344.  In order to secure a conviction under 1344, the government must prove that

(1) the defendant knowingly (2) engaged in a scheme to defraud or participated in a scheme to

obtain funds under the custody and control of (3) a financial institution by means of false

statements or representations.  United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987).

"Financial institution," as defined at 18 U.S.C. § 20, includes a bank insured by the Federal

Deposit Insurance Corporation ("FDIC").  18 U.S.C. § 20(1).  Thus, one of the essential

elements of bank fraud in violation of § 1344 is that the victim of the defendant's fraudulent

activities be a federally-insured financial institution.  In addition, proof of FDIC insurance is the

basis for federal jurisdiction in bank fraud cases.  United States v. Schultz, 17 F.3d 723, 725 (5th

Cir. 1994).

Defendant's challenge to the grand jury's articulation of the jurisdictional element for

bank fraud in the Indictment is virtually identical in substance to the challenge he successfully

levied against the bank fraud charge contained in the Second Superceding Indictment.  In

dismissing Count One of the Second Superceding Indictment, this Court found that the grand

jury had failed to assert that Defendant had defrauded a financial institution, as that term is

defined at 18 U.S.C. § 20.  Defendant now argues that the revisions to Count One in the Third

Superceding Indictment also fail to allege that Defendant defrauded a financial institution.  The

Court will relies on the same statutory and case law as it did in its November 29, 2004 Order

dismissing Count One of the Second Superceding Indictment to find that the grand jury properly

charged Defendant under § 1344 in the Third Superceding Indictment.

As they have since the inception of this case, both parties agree that Congress, the entity

to which the Indictment alleges that Defendant directly made fraudulent statements, is not a

federally-insured financial institution.  The Indictment, however, charges Defendant with a

violation of § 1344 based on the closeness of the relationship between Congress and First Union

National Bank ("First Union"), which is a financial institution.  United States v. McGlothin,

2002 WL 717080, *2 (3d Cir. 2002) (taking judicial notice that First Union is a "financial institution" under 18 U.S.C. § 1344).

In this Court's Order of November 2004, it found the First Circuit's decision in United States v. Walsh, 75 F.3d 1 (1st Cir. 1996), to be directly on point in addressing the question of the required nexus between a federally-insured parent and a non-federally insured subsidiary, where the government has alleged that the direct victim of the fraud is the subsidiary.  In that case, the defendant executed a scheme to fraudulently obtain mortgages from a wholly-owned subsidiary of Dime Savings Bank of New York.  While Dime Savings Bank of New York was federally insured, the subsidiary, who was the direct victim of the fraudulent activities, was not. In upholding the defendant's conviction, the First Circuit cited the following facts as relevant: 1) the subsidiary was wholly-owned, 2) the parent provided all the subsidiary's operating capital, 3) the parent dictated what loan products the subsidiary would offer, and 4) the parent was assigned and serviced all mortgages entered into by the subsidiary.  Id. at 9.  The combination of these factors, the court found, made a fraud upon the subsidiary the equivalent to a fraud upon the federally-insured parent.  Moreover, the First Circuit found that, under the factual circumstances, to uphold the conviction would best serve the purposes underlying § 1344 – to protect the assets of a federally insured bank.  Id.; see also, United States v. Laljie, 184 F.3d 180, 189 (2d Cir. 1999) (stating that the purpose of § 1344 is to "protect the federal government's interest as an insurer of financial institutions").

The defect of the Second Superceding Indictment was its paucity of allegations related to the connection between Congress and First Union.  That indictment contained only an allegation that Congress was a wholly-owned subsidiary of First Union and a recitation of the elements of a bank fraud charge referencing First Union.  The Court concluded that it could not "leap to the

conclusion that defendant's alleged fraud deprived First Union of its monies or other property without more information than the bare assertion that a parent-subsidiary relationship existed between the two" and that "the factual allegations of the indictment [were] insufficient to establish that Congress is the equivalent of a financial institution under the bank fraud statute." United States v. Bortnick, 2004 WL 2752471 at *4 (E.D. Pa. Nov. 19, 2004).

The Third Superceding Indictment does not suffer from the same defects, as it establishes a sufficient connection between First Union's federally-insured funds and those extended to Defendant by Congress. The Indictment alleges the following relevant facts with respect to Congress, First Union, and the relationship between the two:

1.  In or about September 1998, First Union was a financial institution whose deposits were insured by the FDIC. Third Superceding Indictment at ¶ 6.
2.  Congress is a wholly-owned subsidiary of First Union. Id. at 7.
3.  First Union determines what kind of loan products Congress may offer. Id. at ¶ 8.
4.  Congress loan agreements must comply with First Union credit policies. Id.
5.  Congress is required to report any issues with lender compliance to First Union; to the extent that a borrower cannot pay, First Union instructs Congress how much to write off as a loss. Id. at ¶¶ 8, 12.
6.  Congress makes and collects loans in accordance with First Union policies. Id. at ¶ 9.
7.  Congress is entirely funded by First Union; First Union provides Congress with its operating capital, which is used by Congress, in part, to make and fund its asset-based loans. Id. at ¶ 10.
8.  Congress and First Union file consolidated financial statements; therefore, any loss incurred by Congress is reflected in First Union's consolidated financials. Id. at 11.

The Indictment also alleges that Congress brought Defendant's loan to First Union as a "problem loan" in late 1999 or early 2000, at which point First Union provided Congress with an appropriate write-off amount. Id. at ¶ 15. The Indictment goes on to allege that the loss suffered by Congress on Defendant's loan was reflected on the consolidated financial statement of First Union. Id.

While the Indictment does not include every factor cited by the First Circuit in <u>Walsh</u>, it does not need to.  Accepting, as it must, all the allegations in the Indictment to be true, the Court finds that the United States has set forth sufficient allegations in the Indictment to show that the relationship between Congress and First Union was such that the alleged fraud upon Congress put the assets of a federally insured institution at risk.  While all of the above allegations point to this conclusion in their totality, the key allegations are that Congress is entirely funded by First Union and that Congress uses the operating capital provided it by First Union to extend its asset based loans – the kind of loan it extended to Defendant.  The bank fraud statute is designed to protect federal funds and the Indictment alleges that the federal funds were put at risk by Defendant's alleged activities.  The jurisdictional element is therefore satisfied and Defendant's Renewed Motion to Dismiss Count One of the Indictment (Doc. No. 312) is denied.

**B.     A Reasonable Jury Could Have Found the Jurisdictional Element of Bank Fraud**

Defendant argues that the government failed to prove at trial that, during the relevant time period, that First Union was FDIC insured and that First Union was Congress's parent. Even if the government's proofs on those two points could be seen as sufficient, the Defendant further argues that the United States did not offer testimony showing the required linkage between Congress and First Union. The government contends that the jury had sufficient evidence before it at trial to find that First Union had acquired Congress at the time the loan agreement was executed, that First Union was FDIC insured at the time the fraud was being perpetuated, and that a relationship existed between First Union and Congress such that Defendant's fraud resulted in his obtaining money that belonged to a financial institution.

At trial, two Congress employees testified to the issues raised by Defendant – loan officer John Garvey and executive vice president and senior credit officer Andrew Robin. Their testimony was unequivocal on the point that Congress is not FDIC insured, but that First Union is FDIC insured. Garvey 1/19/05 at 56-57; Robin 2/3/05 at 15. Mr. Robin offered further, more detailed, testimony as to the relationship between Congress and First Union. He testified that Congress is currently a wholly-owned subsidiary of Wachovia Bank, which used to be First Union. Robin 2/3/05 at 11. Mr. Robin testified that all of the money that Congress lent to its clients originated with First Union; that First Union and Congress filed consolidated financial statements; that Congress' losses were therefore reflected in First Union's financial statements; that First Union "blessed" all of Congress' loan policies; that First Union determined the kind of loan products Congress could offer; that loan officers reported any loan that appeared to be a loss for Congress to First Union; that First Union had the final say as to the amount Congress

could write off as a bad loan; and that Congress was audited by the same federal officials as First Union.  Id. at 11-15.

The testimony at trial was also clear that Congress has been a subsidiary of three different entities since 1998.  Congress employee Frederick Kiehne testified that Congress was a wholly-owned subsidiary of CoreStates at the inception of Defendant's relationship with Congress, as well as during the period of time when the loan was being negotiated and a Loan Proposal Letter was forwarded to Defendant.  Kiehne 1/18/04 at 4-5. Mr. Robin testified that First Union had become the parent entity in September of 1998, when Defendant executed the Loan Agreement.  Robin 2/3/05 at 11.  Mr. Robin also testified that First Union became Wachovia in April of 2002.  Id. at 13.  Kiehne also testified to this sequence of events, though not the exact dates, as well as to the fact that Congress was and is a subsidiary of CoreStates, First Union, and Wachovia.  Kiehne 1/18/04 at 3.

The thrust of Defendant's argument with respect to the relationship between First Union and Congress is that all of the above testimony was in the wrong tense and that therefore the government's proof was insufficient to show that, at the time of the offense, (1) First Union was federally insured, (2) Congress was a subsidiary of First Union, and (3) the relationship between First Union and Congress was so intertwined that a fraud upon Congress was a fraud upon First Union.  Defendant relies upon the Ninth Circuit's holding in United States v. Allen, 88 F.3d 765 (9th Cir. 1996).  In that case, the Ninth Circuit vacated a conviction for making false statements in loan applications to a federally insured financial institution in violation of 18 U.S.C. § 1014 because the only testimony on the bank's insurance status was offered in the present tense.  The Ninth Circuit found that the testimony did "not establish that the credit union was insured when Allen made his fraudulent statements" and rejected the government's argument that the jury

could have reasonably inferred from this testimony that the bank was insured at the time of the statements. Id. at 769.

The Court's research has uncovered no other Circuit that has taken a similar position on the sufficiency of present-tense testimony to establish the existence of a certain state of affairs in the past.  As a general matter, the leading treatise on evidence has this to say about the matter: "When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later period*. . . . Similar considerations affect the use of *subsequent existence* as evidence of existence at the time in issue."  2 John H. Wigmore, Wigmore on Evidence § 437, at 513 (emphasis in original). Other Circuits have applied this general principle to this particular evidentiary question and found that a court's analysis should focus on whether the present-tense testimony, viewed in context, supports a reasonable inference that the bank was federally insured at the time of the fraud.  See, e.g., United States v Judkins, 267 F.3d 22, 23 (1st Cir. 2001); United States v. Nnanyererugo, 39 F.3d 1205, 1208 (D.C. Cir. 1994); United States v. Rangel, 728 F.2d 675 (5th Cir.1984); United States v. Silker, 751 F.2d 477, 484-85 (2d Cir. 1984); United States v. Knop, 701 F.2d 670, 673 (7th Cir. 1983); United States v. Safely, 408 F.2d 603, 605 (4th Cir. 1969); Cook v. United States, 320 F.2d 258, 259-60 (5th Cir. 1963).

Though the Third Circuit has not spoken directly to the question, in United States v. Abuhouran, 162 F.3d 230 (3d Cir. 1998), the Third Circuit considered a defendant's challenge to the government's proof that the target of his fraudulent activity was federally insured, as required by § 1344.  The Court upheld the conviction, finding that a jury could have reasonably understood witness testimony that a bank's deposits were insured (without a specific time frame) to refer to the years in which the deposits were affected by the defendant's fraudulent activity.

Id. at 234.  The Court therefore believes that the Third Circuit would apply the standard followed by the majority of Circuits.

Viewed in context, then, the evidence at trial was sufficient for a reasonable jury to find the jurisdictional element of the wire fraud statute had been met.  With respect to the timing issue, Mr. Robin testified that First Union did not exist at the time of trial. Robin 2/3/05 at 13.  It would have been perfectly reasonable, therefore, for the jury to have concluded that the present-tense testimony offered by the government's witnesses referred to the status of First Union and the relationship between Congress and First Union at the time the scheme to defraud was ongoing.  The testimony of Mr. Robin also supported all the allegations that the United States made in the Indictment regarding the relationship between First Union and Congress.  Such testimony, when combined with that of Messrs. Garvey and Kiehne, is more than sufficient for a rational jury to conclude that the Defendant's activities put federally-insured funds at risk. The jurisdictional element is therefore satisfied and Defendant's Renewed Motion to Dismiss Count One of the Indictment and, in the Alternative, for Judgment of Acquittal on Count One due to the Government's Failure to Allege or Prove that Alleged Bank Fraud Victim was FDIC Insured (Doc. No. 312) is denied.

C.      A Reasonable Jury Could Have Found the Jurisdictional Basis for Wire Fraud

The federal wire fraud statute, 18 U.S.C. § 1343, prohibits the use of wire, radio, or television communications in interstate or foreign commerce to execute a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1343.  Like the bank fraud statute, the wire fraud statute requires the government to prove a jurisdictional element, specifically, that the fraudulent transmissions traveled interstate.  See Smith v. Ayers, 845 F.2d 1360, 1366 (5th Cir. 1988) ("[A] purely intrastate communication would be beyond [Section 1343]'s reach.").

Defendant argues that the government introduced no evidence at trial that any of the wire transmissions charged in Counts Two through Eighteen were faxed across state lines.  In addition, Defendant argues that the government's proofs with respect to the wire transmissions at issue in Counts Eleven through Eighteen suffer an additional defect in that there was no evidence introduced at trial that those transmissions were faxed at all.  The government argues that there was sufficient evidence for the jury to find that the transmissions at issue were faxed from Pennsylvania to New York.

    1.      A reasonable jury could have found that the IRCs were faxed.

The wire transmissions that form the basis of the wire fraud charges in Counts Two through Eighteen are the individual inventory report certifications that Defendant was required to submit periodically to Congress under the Loan Agreement.  In order to show these IRCs were faxed, the government offered the testimony of John Garvey and former MGL Corporation controller Adam Greene.  Mr. Garvey offered the following testimony with respect to the Defendant's method of providing the required inventory certification reports to Congress: "The – inventory report certification, and as far as the breakdown of the inventory, that would be – that

17

would be faxed over to us at Congress Financial." Garvey 1/19/05 Tr. at 78. Mr. Garvey confirmed this point later on in his testimony and reiterated this method of transmission on cross-examination, though he did state that he could not remember if every single certification at issue in Counts Two through Eighteen was faxed. Id. at 93, 112-13. For his part, Adam Greene testified that, during this employment at MGL, he was the person who faxed the IRCs. Greene 1/20/05 at 12. Mr. Greene also testified that the IRCs were signed by Defendant, then "[t]ypically, the first few pages were faxed and then overnighted the next day." Id. at 12. When asked to clarify what he meant by the term "typically," Greene testified that it was MGL's business practice to fax the first few pages to Congress. Id. at 12-13. Greene's testimony is supported by the IRCs dated December 31, 1998, April 16, 1999, May 14, 1999, June 17, 1999, and December 14, 1999, all of which bear a partial or full fax line at the top of the documents containing the date they were faxed and the words "Congress Financial." Gov't Exs. CF 100, CF 102, CF 104, CF 106. The April 16, 1999 fax lines also contains the words "MGL Corporation" and a fax number with a (215) area code, which is presumably that company's fax number. Gov't Ex. CF 102. To show that the business practice he described continued after Greene left MGL in late August of 1999, the government introduced the December 15, 1999 inventory certification report, which bore the same MGL facsimile header and the (215) area code number. Gov't Ex. CF 115.

The Court finds that a reasonable jury, viewing the above evidence, could have drawn an inference that the IRCs underlying Counts Two through Eighteen were faxed. There can be no dispute as to whether the jury could find the IRCs dated December 31, 1998, April 16, 1999, May 14, 1999, June 17, 1999, and December 14, 1999 were so transmitted, as those IRCs bear a fax heading. With respect to the remaining IRCs, the government's proof of faxing is

circumstantial, namely the testimony of Greene and Garvey that the first few pages of the IRCs were consistently faxed to Congress.  This Court is bound to give the government the benefit of all inferences to be drawn from the evidence presented, United States v. Patrick, 985 F. Supp. 543, 548 (E.D. Pa. 1997).  In examining the required proof of transmission under the federal mail fraud statute, which it has held is virtually identical to the federal wire fraud statute, see United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994), the Third Circuit stated that "it is well-established that evidence of a business practice or office custom supports a finding of the mailing element . . ." so long as "some reference to the correspondence in question is required." United States v. Hannigan, 27 F.3d 890, 892-93 (3d Cir. 1994).  In Hannigan, the Third Circuit emphasized that "the business practice may be established by the testimony of anyone with personal knowledge of the business custom and practice." Id. at 894.  At trial, two such witnesses with personal knowledge offered testimony – Mr. Greene testified that he was the person at MGL responsible for faxing the IRCs while he was employed there and Mr. Garvey testified that he received the IRCs from MGL by fax.  The jury could make a reasonable inference that the practice continued after Mr. Greene's departure based on the testimony of Mr. Garvey and the facsimile header on the December 14, 1999 IRC.  A reasonable jury thus could have concluded that the IRCs underlying Counts Two through Eighteen were faxed.

     2.     *A Reasonable Jury Could Have Found That the Faxes Crossed States Lines*

On the question of whether the IRC faxes traveled across interstate lines, Defendant argues only that the government did not prove that the faxes crossed state lines into New York.[2] Because neither Mr. Garvey nor Mr. Greene testified that the IRCs were sent to the Congress office in New York, the government argues that the documentary evidence introduced at trial is

---

[2]     At the hearing on this motion, counsel for Defendant stated that he did not "contest that the record through oral testimony and documentation shows that the charged faxes in Counts Two through Eighteen came out of the great State of Pennsylvania."  5/4/05 Hrng. Tr. at 51-52.

sufficient to show that Mr. Garvey and his collateral assistant, who received the fax transmissions, were located in Congress's New York office at all times relevant to the fraudulent wire transfers.

To begin, there was undisputed testimony at trial that John Garvey was the loan officer at Congress managing Defendant's loan. Garvey 1/19/05 at 58; Kiehne 1/18/05 at 1. The government also introduced numerous documents that reflected that John Garvey worked out of the Congress New York office, including letters and business correspondence from Defendant, correspondence to Garvey from third parties, audit reports from fellow Congress employees George Dobrick and Maryanne Picnic, and the loan documents and amendments thereto. See, e.g., Gov't Exs. CF-6; CF-9; CF-10; CF-12; Bonner 5; Buxbaum 2, at 7; Buxbaum 3, at 6; GD-3; GD-7; GD-11; MP 1; KM-21 at 121, 300, 301, 401, 402.

Defendant also argues that, even if there was circumstantial evidence that Mr. Garvey was located in the state of New York, the government's proofs are still insufficient, as the government presented no evidence that his collateral assistant, whom Garvey testified was the initial recipient of the IRCs, was in New York. Garvey 1/19/05 at 72. In response, the government points to Mr. Garvey's response, when asked how he received the IRCs, that they would be "faxed over to us at Congress Financial" and that the backup information would be "sent over to us" through the mails. Id. at 78. Later, on cross-examination, Mr. Garvey testified that, in order for additional funds to be released to Defendant, the IRCs "were faxed over to us" and that "Mr. Bortnick would fax the certification in order for us to do advances." The government argues that a reasonable jury could find that Mr. Garvey's use of the plural "us" indicated that he and his collateral assistant, to whom the IRCs were initially faxed, were both located in New York.

Viewing all of the above evidence in the light most favorable to the government, a reasonable jury could have found that the faxes traveled from Pennsylvania to John Garvey and his collateral assistant in New York.  The documentary and testimonial evidence is clearly sufficient for a finding that Mr. Garvey was based out of the Congress office in New York and it would be reasonable for a jury to draw the inference that the IRCs were faxed to him at that New York office, as it was his regular place of business and as Defendant had sent previous communications regarding the loan to Mr. Garvey at that location.  Though the government's evidence is much sparser on the issue of where Mr. Garvey's collateral assistant was located, a reasonable jury could have interpreted the testimony of Mr. Garvey regarding how the IRCs were received and processed to indicate that his collateral assistant was located in New York with him.

The evidence at trial was sufficient as to the jurisdictional element of wire fraud.  As such, Defendant's Renewed Motion for Judgment of Acquittal on Counts Two Through Eighteen (Doc. No. 308) is denied.

**III.    BANK AND WIRE FRAUD IN VIOLATION OF 18 U.S.C. §§ 1343, 1344**

Defendant levies several more challenges to his convictions for bank and wire fraud. Specifically, he argues that (1) that the jury's conclusion was based on a misreading of the Loan Agreement between himself and Congress; (2) that the government's primary theory of bank fraud was legally invalid; (3) that the government failed to present sufficient evidence that the IRCs contained incorrect information regarding the value of Defendant's inventory; and (4) that the government failed to prove substantially the same scheme to defraud that it charged in the Indictment. Defendant's first two arguments are related and will be addressed in tandem; his other two arguments will be addressed in turn.

A.    A Reasonable Jury Could Have Found That Overseas Inventory Was Ineligible Under the Loan Agreement Between Congress and Defendant.

The Defendant argues that the jury's conviction for bank and wire fraud rested on the erroneous conclusion that inventory located overseas was not eligible inventory, as defined in the Loan Agreement.  The Defendant further argues that the government's theory at trial – that the inclusion of foreign inventory in the seventeen IRCs at issue in this case was fraudulent – is legally untenable because not a single witness was able to testify that Congress could not perfect a security interest in Russia or any other location overseas.  The government argues that Defendant is essentially mounting a challenge to the sufficiency of the evidence on the bank and wire fraud counts and that the evidence presented at trial on the point of whether overseas inventory could serve as a basis for the loan was sufficient to show that it could not and that Defendant fraudulently included such inventory in the IRCs faxed to Congress.

At trial, the government introduced the Loan Agreement between Defendant and Congress.  Gov't Ex. CF-2.  As stated above, the asset underlying the loan Defendant received from Congress was the inventory of MGL, MGL Apparel, and Lorianna, defined as "all of

Borrower's now owned and hereafter existing or acquired raw materials, work in process, finished goods and all other inventory of whatsoever kind or nature, wherever located."  Gov't Ex. CF-2 at 7.  Despite this broad language, Congress placed several limitations on what kind of inventory Defendant could use as a basis for the loan.  Thus, the Loan Agreement contained a list of inventory upon which Congress would not loan Defendant monies.  Gov't Ex. CF-2 at 4-5. This list did not contain inventory located overseas, but it did include inventory in which "is not subject to the first priority, valid and perfected security interest of [Congress]."  Gov't Ex. CF-2 at 4.  The government contended that the Defendant, in addition to employing other methods of fraudulently inflating the amount of inventory he reported to Congress, nevertheless included overseas inventory on the IRCs as eligible under the Loan Agreement.

Where the government proceeds on several different theories of liability in one count of an indictment, a general conviction by a jury can put a trial court in two separate postures when reviewing the sufficiency of the evidence on that count.  In United States v. Griffin, 502 U.S. 46 (1991), the Supreme Court reiterated that, where the evidence presented at trial is insufficient to support a conviction on one alternative theory in a count but sufficient to convict on another alternative theory charged to the jury in the same count, then a reviewing court should let the jury verdict stand by assuming that the jury convicted on the factually sufficient theory.  Id. at 49-50.  Griffin also stated however, that if one of two or more of the alternative theories supporting a conviction on a single count is either (1) unconstitutional or (2) legally invalid, then the reviewing court should vacate the jury verdict and remand for a new trial without the invalid or unconstitutional theory.  Id. at 56.  Though a court presumes that a jury is able to distinguish factually sufficient evidence from factually insufficient evidence, it cannot presume that the jury has the competence to distinguish accurate statements of law from factually inaccurate ones.  Id.

at 59.  The distinction between a finding that an alternative ground for a conviction is factually unsupported versus a finding that it is legally invalid is therefore crucial - if it is the former, the conviction may still stand; if it is the latter, the conviction must be reversed.  The threshold question for this Court, then, is whether Defendant's challenge is truly a challenge to the sufficiency of the government's evidence or whether his argument is one of legal invalidity.

In <u>United States v. Syme</u>, 276 F.3d 131 (3d Cir. 2002), the Third Circuit stated that "A theory upon which a criminal charge rests is legally invalid under <u>Griffin</u> if the indictment or the district court's jury instructions are based on an erroneous interpretation of law or contain a mistaken description of the law."  <u>Id.</u> at 145.  In <u>Syme</u>, the defendant, an ambulance company operator, was accused of violating the federal mail and wire fraud statutes by submitting false bills stating that the "home station" of his companies was in Philadelphia; the government alleged that he fraudulently reported Pennsylvania as his home station because of the substantially higher Medicare-approved reimbursement rates associated with that location.  The defendant argued that his conviction was invalid because of the legal invalidity of the "home station" scheme because federal law did not authoritatively define "home station" at the time of the scheme to defraud.  The Court rejected this argument, and held that defendant's conduct fell within the mail and wire fraud statutes, even if there was no testimony or evidence on what the exact legal definition of "home station" was at the time of the scheme.  The Court held that the government could have demonstrated a "scheme to defraud" by showing that there was a generally understood meaning for the term "home station," that the defendant knew of that meaning, and that he knowingly used a Philadelphia address in order to be paid at the higher rate.  <u>Id.</u> at 146-47.  Because the meaning of "home station" was a disputed factual issue, the Court concluded that the jury had properly resolved it in favor of the government.  <u>Id.</u> at 147.

The only potential question of law that the indictment or the jury instruction could err upon in this case is whether Defendant's inclusion of overseas inventory in the IRCs falls outside the statutory definition of conduct that constitutes bank and wire fraud.  As stated above, the bank fraud statute requires the government to prove that the defendant knowingly engaged in a scheme to defraud a federally-insured financial institution.  The wire fraud statute prohibits executing a scheme to defraud using wire, radio, or television communication in interstate or foreign commerce.  A "scheme to defraud" has been defined to include "any plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations intended to deceive others in order to obtain something of value." United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir.1987).  "Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." Id. at 624.  The government need not prove that the bank actually suffered a loss or that the defendant personally benefited from the scheme.  Id. at 624-25 (citing United States v. Hopkins, 716 F.2d 739, 746 n. 10 (10th Cir.1982); United States v. Williams, 728 F.2d 1402, 1405 (11th Cir.1984); United States v. George, 477 F.2d 508 (7th Cir.), cert. denied, 414 U.S. 827(1973); Freeman v. United States, 20 F.2d 748, 749 (3d Cir. 1927)).

Though Syme is not directly on point in this case, its guidance leads the Court to conclude that Defendant's argument is one of factual sufficiency and not of legal invalidity.  It is clear that Defendant's conduct in including overseas inventory in the IRCs would fall within the category of a course of action intended to deceive Congress to obtain more loan funds if Congress did not lend on such overseas inventory, if Defendant knew that to be so, and if

Defendant included the verboten inventory in the IRCs regardless.  The jury in this case was perfectly capable to evaluate these factual issues.

Defendant's argument, at heart, is that no reasonable jury could have read the Loan Agreement to prohibit the inclusion of overseas inventory.  The testimony at trial, however, given by four Congress employees at the time of the extension of Defendant's loan – Frederick Kiehne, John Garvey, George Dobrick, and Andrew Robin – was sufficient for a reasonable jury to conclude that Congress's inclusion of the statement that eligible inventory did not include "inventory which is not subject to the first priority, valid and perfected security interest of [Congress]," was designed to prohibit the inclusion of overseas inventory.  In addition, the testimony indicated that overseas assets presented additional problems for Congress due to the difficulty in appraising the value and existence of those assets.  The testimony at trial also was sufficient to establish that these issues were communicated to Defendant and that he included overseas inventory in the IRCs he sent to Congress regardless.

Mr. Kiehne testified that Congress did not lend on overseas inventory outside the United States because it could not, under the UCC, perfect on that interest.  Kiehne 1/18/05 at 20-22, 35-36, 40-41.  He testified that certain countries, namely the United Kingdom and Canada had laws comparable to the United States, but that no other country had developed laws that would allow asset-based lenders to become comfortable in their ability to claim first priority on assets located within their borders.  Id. at 21. Mr. Kiehne also testified that it would have been his practice to explain to the borrower the issues with perfecting a security interest outside the United States and why that disqualified overseas inventory from serving as a basis for their loan; John Garvey's testimony indicates that he understood Mr. Kiehne to have had that conversation with Defendant.  Id. at 35-36; Kiehne 1/19/05 at 28; Garvey 1/20/05 at 6-8.  Mr. Kiehne, Mr.

Garvey, and Andrew Robin clearly testified that the Loan Agreement did not expressly prohibit overseas inventory from serving as eligible inventory, but that a prohibition on that kind of inventory was encompassed by the requirement that eligible inventory be of the kind in which Congress could perfect a first priority interest.  Kiehne 1/18/05 at 44-45, Kiehne 1/19/05 at 25; Garvey 1/19/05 at 65-66; Garvey 1/20/05 at 6-8, 10-11, 47; Robin 2/3/05 at 109-10.  Messrs. Kiehne and Garvey also testified that Congress' policy regarding overseas inventory stemmed from the difficulty auditing the amount of that inventory actually held by the borrower at any given time.  Kiehne 1/18/05 at 45; Garvey 1/19/05 at 66; Garvey 1/20/05 at 7. Congress auditor George Dobrick testified that, in assessment of Defendant's borrowing base, prior to the issuance of the loan agreement, did not include a review of overseas inventory holdings in making his determination of Defendant's current inventory levels because Congress did not consider it to be part of the borrowing base.  Dobrick 4/7/04 at 24-26.  Mr. Dobrick also testified that Defendant informed him that the only inventory able to collateralize the loan was that held domestically. Id.  Finally, the jury heard testimony from David Ellis, the President of Buxbaum Group, a company engaged by Congress to appraise Defendant's companies prior to the Loan Agreement. Mr. Ellis testified that Defendant informed him that his overseas inventory was not eligible to serve as collateral for the loan.  Ellis 1/20/05 at 8-9.  Mr. Ellis further testified to the UCC issue discussed by Messrs. Kiehne, Garvey, and Robin and corroborated their statements that an asset-based loan, like the kind obtained by Defendant, would not be extended based on assets located overseas.  Id. at 46-47.

Given all this, the inclusion of overseas inventory falls comfortably within the definition of conduct prohibited by the bank and wire fraud statutes (i.e. engaging in conduct that constitutes "a departure from fundamental honesty"), and so Defendant's Griffin challenge to

Counts One through Eighteen must fail.  Moreover, the Defendant has never contested that he included overseas inventory in his IRC, and so a reasonable jury could have found that Defendant's inclusion of overseas inventory was part of an overall scheme to defraud Congress. As such, the Court rejects Defendant's challenge based on the government's presentation of the overseas inventory issue.[3]

**B.   A reasonable jury could have found that the inventory amounts listed on the IRCs were fraudulently inflated and that Defendant therefore made fraudulent misrepresentations to Congress.**

Defendant's loan was based on the value of his inventory, which included both finished garments and raw materials such as fabric, defined in the Loan Agreement as the lower of the cost of the inventory or its market value.  CF-2 at 10.  The purpose of the IRC was not only to comply with the reporting requirements contained in the Loan Agreement, but also to determine the amount of money that Defendant could borrow from Congress.  To the extent that Defendant's eligible inventory increased, he was eligible to borrow more money under the Loan Agreement.  Garvey 1/20/05 at 42.  These additional funds were available to Defendant soon after he submitted an IRC showing an increased amount of eligible inventory.  Id.

Defendant argues that the government's failure to present any evidence contemporaneous with the submission of the IRCs that the inventory amounts included on those transmissions were inflated; he argues that the after-the-fact analyses by outside professionals was unreliable and insufficient to support the jury's guilty verdict on Counts One through Eighteen.  The government relies on the documentary and testimonial evidence from several outside professionals, including Karl Meingosne, George Dobrick, Marianne Picnic, forensic accountant Daniel Coffey, and consultant John Bonner, to argue that the jury had sufficient evidence before it to conclude that Defendant consistently overstated the amount of inventory on the IRCs.

A discussion of the government's proofs on the alleged inventory inflations, in this case, must begin at the end of the scheme to defraud.  As an overall matter, the final inventory counts of John Bonner and the testimony of Daniel Coffey was sufficient for a jury to find that, at the end of the alleged scheme to defraud, there was a substantial and unexplained discrepancy between the amount of inventory actually held by Defendant's three companies and the amount of eligible inventory that was being reported to Congress.  John Bonner, a consultant, the interim Chief Operating Officer of MGL, and appointed liquidation manager for the bankrupt companies, testified at trial that one of his responsibilities was to marshal the assets of the companies and that he began having conversations with the Defendant regarding his fabric and garment inventories on December 16, 1999.  Bonner 1/28/05 at 20, 25-27.  Bonner testified that he focused on the inventory in the MGL warehouse and in the Lorianna stores, because that was where Defendant repeatedly told him that the companies' entire inventory was located.  Id. at 28.

---

[3]      As the jury rationally found that the inclusion of overseas inventory was absolutely verboten, no matter what the amount, the Court will not address Defendant's secondary argument that the amount of overseas inventory that appears on the IRCs was not inflated.

Bonner testified that, based on a December 1999 audit performed by George Dobrick, with the assistance of Defendant and his MGL staff, he expected to find approximately 754,000 garments and 3,600,000 yards of fabric at the MGL warehouse and in the Lorianna stores. Id. at 25-26; Gov't Ex. Bonner-9.  Instead, Bonner found 519,544 garments and 1,516,624 yards of fabric. Bonner 1/28/05 at 34, 37-38; Gov't Exs. Bonner-24(b) at 477, Bonner-11(b) at 487.  Using an average price of $13.32 per garment and a 1.37 overhead multiplier, as determined to be appropriate by Mr. Meingossner,[4] Bonner calculated that Defendant had only about $9.4 million in garment inventory at the end of the scheme to defraud, as opposed to the $17 million in combined garment inventory reported on the December 20, 1999 IRC for Lorianna and MGL Apparel.  Coffey 2/8/05 at 38-39; Gov't Ex. CF-116.  Using an average price per yard of fabric of $1.27 and a 1.16 overhead multiplier, Bonner found that the Defendant had only $2.3 million, as opposed to the $6.9 million reported on the December 20, 1999 IRC for MGL.  Coffey 2/8/05 at 37-38; Gov't Ex. CF-116.  The jury could have reviewed this testimonial and documentary evidence and concluded that the discrepancy between Defendant's actual inventory, as calculated by Bonner, and the amount Defendant was reporting to Congress, as reflected on the December 20, 1999 IRC, came to approximately $12 million dollars.

The government's presentation also contained evidence sufficient to support a jury finding that, at various points in the scheme to defraud, Defendant made fraudulent adjustments to his books and records that had the effect of overstating all of the subsequently submitted IRCs.  The jury could reasonably have concluded that the cumulative effect of these adjustments was the $12 million difference between the inventory count performed by Mr. Bonner and the amount of inventory being reported by Defendant to Congress.  For the sake of completeness, the government's presentation on those individual adjustments is discussed below.

Count Two of the Indictment alleged only one form of inventory inflation — the inclusion of $1.8 million in overseas inventory, located in Holland and Germany, on the December 31, 1999 IRC.  Gov't Ex. Coffey-1.  Though Defendant has never denied the inclusion of overseas inventory in his reports, the Court will briefly review the evidence at trial related to the overseas inventory included in the IRC underlying Count Two.  Karl Meingossner, who performed a 1998 year-end audit for the three companies, testified that his audit work papers showed that MGL had $1.8 million in inventory located in Holland and Germany as of December 31, 1998.[5]  Meingossner 1/27/05 at 129-30.  Mr. Meingossner also testified that the total inventory number that he calculated for the period ended December 31, 1998, which included the $1.8 million in overseas inventory, was within $15,000 of the inventory amount reported on the IRC underlying Count Two. Id. at 168-72.  This is sufficient for a jury finding that the December 31, 1999 IRC included overseas inventory, which the jury properly found to be prohibited by Congress, and therefore that the inventory amount on that IRC was inflated.

The government alleged at trial that the IRCs underlying Counts Three through Eighteen were fraudulently inflated due to adjustments made to the Lorianna overhead in March and June.[6]  Gov't Ex. Coffey-1. Karl Meingossner testified that he performed a full audit on Defendant's companies for 1998, during which he discovered that Defendant's companies were

---

[4]        The true cost of Defendant's garments was a hotly contested factual issue both before and at trial in this matter.  The record at trial establishes sufficient support for Mr. Coffey's calculation of $13.32, as delineated in the government's omnibus reply to Defendant's motions.  See Gov't Opp'n at 33-39.

[5]        The list of inventory held by the three companies was provided to Meingossner by Defendant; Meingossner then sent letters to the overseas holders to confirm the values provided by.  Meingossner 1/27/05 at 119, 128.

[6]        Counts Three through Eight were solely premised on the overhead inventory adjustments of Lorianna and the MGL additions for fiber.  The remaining counts included other alleged inflations that will be discussed below.

overstating their overhead costs. Gov't Ex. KM-21 at 5. As a part of this 1998 audit, Mr. Meingossner calculated that the correct overhead percentage was 37% of the finished goods value; he communicated this number to Defendant. Meingossner 1/27/05 at 121. The jury heard testimony from Mr. Meingossner that, as a result of this new calculation, Defendant's garment inventory was reduced on the Lorianna books by approximately $1.1 million, to reflect the appropriate overhead calculation. Id. at 130-31. Mr. Coffey testified that the result of the adjustment was that Defendant's Lorianna inventory on his books and records was now lower than the inventory that had previously been reported to the bank and that Defendant should logically have adjusted the inventory reports to the bank to reflect the lower, correct inventory number. Coffey 2/7/05 at 168-69. The government introduced, at trial, the Lorianna ledger, which Coffey testified showed that, instead of decreasing the amount of inventory being reported to Congress, there were two large increases to the Lorianna overhead number in March and June of 1999, which brought the books and records of Lorianna back in line with the inventory certifications.[7] Coffey 2/7/05 at 166-171; 2/8/05 at 7-9; Gov't Exs. Coffey-LS Overhead 1 and 2. The IRCs underlying Counts Three through Eighteen were filed by Defendant beginning in April of 1999, after Defendant's first alleged adjustment to the Lorianna books. Gov't Exs. CF-101-116. A reasonable jury could therefore have concluded, that Defendant knowingly made adjustments to the Lorianna inventory figure to avoid reducing the amount of Lorianna inventory he reported to Congress and that these adjustments were reflected in the IRCs filed from April to December 1999.

Under the Supreme Court's holding in Griffin, the above findings by the jury are sufficient to carry the government's burden of showing the element of a scheme or artifice to defraud necessary to support a wire fraud conviction on Counts Two through Eighteen, as at least one factual allegation of inventory inflation was satisfactorily proved for each of the IRCs at issue. United States v. Griffin, 502 U.S. 46, 49-50 (1991) (stating that where evidence presented at trial is sufficient to convict on one theory of several charged to the jury in the same count, reviewing court should presume the jury convicted on factually sufficient theory). To be thorough, however, and to fully address Defendant's Rule 19 arguments, the Court will briefly address the government's proofs on the other factual bases offered at trial for the proposition that Defendant knowingly included inflated inventory amounts on the IRCs underlying Counts Three through Eighteen.

The government alleged at trial that the IRCs underlying Counts Three through Eighteen were inflated due to fraudulent additions to MGL's fiber inventory. Mr. Coffey testified that the MGL computer system available to him when he first arrived at MGL[8] reflected that, in November of 1999, the amount of fiber inventory being reported to Congress was approximately a million dollars higher than the fiber inventory that appeared on the books and records of MGL. Coffey 2/7/05 at 180, 184-85; 2/8/05 at 4; Gov't Ex. Coffey-Comparison1. Defendant's attorney provided Coffey with a "restored" version of the MGL computer system, which Defendant indicated would provide support for the inventory reports to Congress. This version contained adjustments to MGL's fiber inventory running from February 15, 1999 to June 10, 1999. Coffey 2/7/05 at 186. Coffey testified that these particular entries and the overall November fiber amount were not only unsupported by the MGL main computer but also were unsupported by the

---

[7]     The testimony at trial was also that, when asked by Coffey to provide justification for these adjustments, the Defendant pledged to provide some, but failed to do so. Coffey 2/7/05 at 170.

[8]     Coffey eventually discovered there were two sets of records for MGL. This topic is discussed in more detail in the section of the Court's memorandum relating to the UNICOM transfers and the Defendant's alleged failure to report these transfers on the bankruptcy schedules for MGL.

Kreisher Miller audit numbers of November 30, 1999. Coffey 2/7/05 at 180. This evidence was sufficient for a jury to find that the fiber adjustments were inflated. In addition, there was also testimony that the fiber at issue was represented on the IRCs as "for Kortex," meaning that it was held overseas in Russia,[9] which rendered it ineligible under the Loan Agreement, as discussed above. This evidence was also sufficient to find that the additional fiber reported on the IRCs underlying Counts Three Through Eighteen were inflated.

The government further alleged at trial that the IRCs underlying Counts Nine through Eighteen, in addition to containing the Lorianna overhead adjustments and MGL fiber adjustments described above, contained a fabricated inventory category labeled as PVI, which Defendant claimed was fiber located in Russia. Gov't Ex. Coffey-1; Coffey 2/7/05 at 175. The testimony at trial was that PVI ultimately accounted for over $1.3 million of fiber reported to Congress as being held by MGL and approximately $300,000 of fiber reported to Congress as being held by MGL Apparel. Coffey 2/7/05 at 177-78. The remainder of the testimony regarding PVI indicated that the professionals who worked for and with Defendant had either never heard of this inventory item or, if they had discerned its existence from an IRC or another document, were never able to locate it. Greene 1/20/05 at 19-20; Halpern 1/21/05 at 20-21; Garland 1/20/05 at 27-28; Bonner 1/28/05 at 48. MGL's controller, Adam Greene, testified that the first he head of PVI was in June 1999, after Defendant's companies had run out of availability under the Loan Agreement. According to Mr. Greene, during June, July, and August of 1999, Defendant provided him with amounts of PVI to add to the MGL inventory account without further explanation; he also testified that these additions were reflected in the IRCs sent to Congress beginning in late June 1999. Greene 1/20/05 at 17-21; Gov't Ex. Greene-4. Moreover, the uncontradicted testimony of Mr. Coffey and Mr. Greene indicates that PVI was represented by Defendant as overseas inventory located in Russia. Coffey 2/7/05 at 175. Thus, a rational jury could have found either that the Defendant's inclusion of PVI on the IRCs were fraudulent because PVI did not exist or because overseas inventory was ineligible under the Loan Agreement.

The government also alleged that the IRCs underlying Counts Eleven through Eighteen contained inflations due to an adjustment to the MGL Apparel inventory number on the books of the Defendant's companies, which was subsequently reflected on Defendant's IRCs. Gov't Ex. Coffey-1. Mr. Coffey testified that there was a "significant" overall adjustment to the MGL Apparel inventory accounts at the end of August 1999, in the amount of approximately $2.1 million. 2/7/05 at 166, 172. Mr. Coffey testified that when asked to justify the adjustments, the Defendant first described the adjustment as a reclassification of inventory, explaining that certain component inventory pieces had been combined into finished goods; when Mr. Coffey pointed out that such a reclassification should not actually increase the level of inventory, the Defendant stated that he agreed that the adjustments were incorrect as an absolute addition to inventory. Id. at 173-74. Despite this, Mr. Coffey testified that the MGL Apparel inventory account, which was used to generate the overall eligible inventory number reported on the IRCs, was never adjusted to fix these overstatements. Id. at 174. As such, Mr. Coffey concluded that the IRCs consistently overstated the eligible inventory for MGL by $2.1 million from August 1999 until the end of the scheme. Id. As with the other alleged inventory adjustments, the government

---

[9]      Coffey also suggested during his testimony that the fiber may have been shipped to Kortex in repayment of a debt, which would mean that it was no longer the property of MGL once it was received by Kortex. Coffey 2/8/05 at 168-70. This would be yet another ground upon which the jury could have found the fiber amounts on the IRCs at issue to be inflated.

presented sufficient evidence at trial to support a jury finding that the inventory amounts on the relevant IRCs contained these unexplained and unsupported adjustments and were therefore inflated.

      The government also presented evidence to the jury that the IRCs underlying Counts Fifteen through Eighteen were inflated because inventory sold by Lorianna Stores in October 1999 to a newly created company controlled by Defendant, Lorianna International, was not deducted from the Lorianna inventory account. Gov't Ex. Coffey-1.  Alex Shnayder, former MGL and Lorianna employee and Defendant's cousin, testified that the purpose of Lorianna International was to mimic the operations of Lorianna and that Lorianna sold its twelve best stores and shipped its best garments to Lorianna International from October 1999 until January 20, 2000.  Shnayder 120/05 at 36-38, 78.  Mr. Coffey testified that his review of the Lorianna records revealed that the Defendant recorded $677,238 in inventory shipments to Lorianna International, but reduced the available inventory on the IRCs by only $269,698,[10] rendering the inventory number on the post-transfer IRCs overstated by approximately $400,000.[11]  Coffey at 2/8/05 at 18; Gov't Ex. Coffey LI-10; Gov't Ex. CF-114 at 2.

      The government also presented evidence that the IRCs underlying Counts Seventeen and Eighteen were overstated because the Defendant failed to deduct inventory that had been shipped to UNICOM through a company known as Distribution Experts. Gov't Ex. Coffey-1.  Coffey's examination of MGL's books and records revealed that 445,373 yards of fabric were shipped in December of 1999 to a related company known as UNICOM.  Gov't Ex. Coffey UNICOM-1(b); Coffey 2/7/05 at 138.  Coffey testified that, as the average cost of the fabric transferred was $1.53, the aggregate value of the transfer was approximately $680,000.  Coffey 2/7/05 at 139. Coffey also testified that this amount was not included in either December inventory report to Congress.  Coffey 2/8/05 at 33-34.

      Defendant argues that, because there is no backup documentation for the two December inventory reports, there is no evidence that those reports were inflated.  This claim is undermined by a variety of circumstantial evidence, which the government is entitled to rely upon in proving its case.  United States v. Griffith, 17 F.3d 865, 872 (3d Cir. 1994).  First, specific to the UNICOM transfers, the documentary evidence showed the November 26, 1999 IRC to reflect a total eligible inventory amount in the amount of for MGL of $7,149,985.  Gov't Ex. CF-114. The December 14, 1999 and December 20, 1999 IRCs both show a total eligible inventory amount of $ 6,964,144, an amount only $185,841 less than the November number.  Gov't Ex. CF-115, 116.  While a variety of inferences might be drawn from these numbers, one acceptable inference would be that the MGL books had not been adjusted to reflect the shipments to

---

[10]    Defendant argues that the partial disclosure of the shipments to Lorianna International to Congress and Congress's approval of those shipments should negate his conviction on the IRCs containing these overstatements because such disclosure precludes a finding of fraudulent intent.  This does not address the fact that the testimony was sufficient to show that Defendant understated the value of the inventory shipped.  Defendant cannot rely on a partial disclosure as a basis for reversing his conviction.

[11]    Defendant cites to Coffey's later testimony for the proposition that the Defendant correctly reported the cost of the inventory sold to Lorianna International on the IRC as approximately $260,000, as opposed to the higher sales price of the inventory.  The record does not support Defendant's reading of Coffey's testimony.  The inventory sold to Lorianna International included inventory that was already in the stores, inventory that was in transit to the stores, and inventory that was held in the company's warehouse.  The $260,000 number cited by Coffey at page 20 of his testimony does not represent the total cost of all the inventory shipped to Lorianna International – it represented the inventory that was in transit and held in the warehouse.  The difference between that number and the total $677,238 number reflected in Defendant's records is the additional inventory that was already held in the Lorianna Stores.  Coffey 2/8/05 at 16, 20; Gov't Ex. Coffey LI-2, LI-3.

UNICOM.  Second, and more generally, the preceding paragraphs delineate a variety of inventory inflations that, once included in the IRCs, remained on the IRCs.  It would be perfectly reasonable for a jury to conclude that these inflations continued to be incorporated into the overall inventory number that appeared on the December IRCs, especially given the $12 million discrepancy in inventory levels that John Bonner testified he was about to discover.

Lastly, the Defendant attacks all of Mr. Coffey's testimony regarding Defendant's inventory levels and the documentary evidence he generated on that topic as after the fact and insufficient for a finding that Defendant was guilty of inflating the inventory amounts reported in the IRCs underlying Counts Three through Eighteen.  The Defendant conducted a vigorous cross-examination of Mr. Coffey at trial and made this very argument to the jury, who resolved the question of Mr. Coffey's credibility and the reliability of his analysis in the government's favor. The Defendant essentially asks this Court to reevaluate Mr. Coffey's testimony and accounting methods, which is not its role in a Rule 29 motion.  United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).  Viewing the evidence in the light most favorable to the government, there was sufficient evidence for a rational jury to find that Defendant inflated his inventory in the numerous ways detailed above.

C.	The Government Did Not Fail to Prove Substantially the Same Scheme to Defraud That It Charged in the Indictment.

The Defendant argues that his convictions for bank and wire fraud cannot stand because the government failed to prove the theory of the case that it presented in the Indictment – that Defendant intended to divert, and did divert, all or a substantial portion of the proceeds of the $22,000,000 loan from Congress to himself, his family, and his associates, and that he intended to bankrupt his companies from the inception of the loan process with Congress.  The government argues that its proofs at trial were sufficient to prove substantially the same scheme at trial that it alleged in the Indictment, which is all that is required as a matter of law.

There are two kinds of variations that can occur between an indictment and the government's proofs at trial.  First, an amendment occurs when the government makes a post-indictment change to the elements of the crime charged.  Such a variance is impermissible, as it has long been the rule that after an indictment has been returned, it may only be broadened through an amendment by the grand jury itself.  See United States v. Stirone, 361 U.S. 212, 215-16 (1960) (citing Ex parte Bain, 121 U.S. 1, 7 (1887)).  The addition of extra-indictment criminal allegations at trial violates the Fifth Amendment's mandate that all prosecutions be commenced by indictment.  Id. at 215.  Therefore, where a defendant argues that the government impermissibly amended the indictment at trial, he or she must show that the variance acted "to modify the indictment so that the defendant is convicted of a crime that involves elements distinct from those of the crimes with which he was originally charged." United States v. Asher, 854 F.2d 1483, 1497 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989).  Second, a variance occurs "where the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  United States v. Castro, 776 F.2d 1118, 1121 (3d Cir.1985), cert. denied, 475 U.S. 1029 (1986).  Where the variance at trial is between the facts proved by the government at trial and those alleged in the indictment, a variance does not constitute reversible error unless the defendant has been prejudiced thereby. Id. at 1122.  The distinction, as the Third Circuit has repeatedly held is between situations in which the defendant is convicted of a crime that involves different elements than the crime with which he was

originally charged and situations in which the facts uncovered at trial differ from those alleged in the indictment.  See United States v. Pelullo, 964 F.2d 193, 216 (3d Cir. 1992).

Defendant's argument is a variance argument, specifically that the factual contours of the scheme to defraud articulated in the Indictment differ from those contained in the government's proofs at trial.  The Defendant seizes upon the language in paragraph 21 of the Indictment to argue that the government failed to show that he diverted the proceeds of the loan to himself, his family, and his associates, and that, therefore, his conviction for bank and wire fraud cannot stand.  The Indictment defines the "scheme to defraud" in the following manner:

> From in or about September 1998 through on or about February 22, 2000 . . . Defendant Gene Bortnick knowing executed and attempted to execute a scheme to defraud Congress and First Union, and to obtain monies owned by and under the care, custody, and control of Congress and First Union, including up to approximately $22,000,000 in financing, by means of false and fraudulent pretenses, representations and promises.

Indictment at ¶ 17.  The Indictment goes on, in the "Manner and Means" section, to describe the various steps in Defendant's scheme to defraud, which included fraudulently inflating the amount of inventory reported on the IRCs; misleading the bank's auditors as to the location and amount of inventory held by his companies; diverting the proceeds of the loan to himself, his family, and his associates, then driving the companies into bankruptcy; purchasing a new home in Florida with the loan proceeds; creating new companies to which Defendant diverted the assets of his bankrupt companies; concealing and transferring assets of the bankrupt companies in anticipation of and during the bankruptcy proceedings; submitting fraudulent schedules and statements of financial affairs during the bankruptcy proceedings on behalf of his companies; and perpetuating and concealing his scheme by adjusting the books and records of his companies, manipulating corporate forms, and frustrating the attempts of third-parties attempting to ascertain the true financial condition of the companies.  Indictment at ¶¶ 18-30.

Defendant's argument is not persuasive, for he alleges only that the government failed to prove one of the factual bases for their theory that Defendant engaged in one overarching scheme of fraud directed at obtaining loan funds from Congress and First Union. Courts have consistently held that, in fraud cases, the government is not required to prove every allegation of

fraudulent activity that appears in the indictment.  The government must prove a sufficient number of fraudulent activities to support a jury inference that there was an overall fraudulent scheme; failure to prove one or more allegations of fraud is therefore not a grounds for the reversal of a conviction.  See, e.g., United States v. Amrep Corp., 560 F.2d 539, 546 (2d Cir. 1977), cert. denied, 434 U.S. 1015 (1978); United States v. Joyce, 499 F.2d 9, 22 (7th Cir), cert. denied, 419 U.S. 1031 (1974).  As such, even assuming that the government did not sufficiently prove that the Defendant diverted the loan proceeds to himself, his family, and his business associates, as discussed above and below, the government did present evidence sufficient to support independent convictions on the lion's share of the remaining steps in Defendant's fraudulent scheme.

Moreover, Defendant was not prejudiced by the government's factual variance.  On the question of what constitutes prejudice, the Third Circuit has noted that, where the government's proofs at trial broaden the possible bases for conviction, such a variance is grounds for reversible error; however, a variance in which the government narrows the bases for conviction, no prejudice inures to the Defendant.  See, e.g. United States v. Castro, 776 F.2d 1118, 1123 (3d Cir. 1985).  Defendant was on notice that the government would present evidence related to the laundry list of fraudulent activities above.  Defendant's argument that the government's failed to prove one step in the scheme to defraud, if accepted as true, means only that the government failed to prove the full scope of the scheme as delineated in the indictment.  This kind of variance does not constitute reversible error.

D.      A Reasonable Jury Could Have Found That Defendant Possessed the Required Intent.

At least a portion of Defendant's argument regarding the government's failure to prove the specific scheme charged in the Indictment relates to the government's proofs on Defendant's

intent to commit bank fraud.  Defendant argues that the testimony at trial showed that he

intended to repay the loan and that the government's statements at trial that he intended to drive

his companies into bankruptcy were demonstrably false and that he therefore lacked the required

criminal intent.  Separately, Defendant also argues that the jury could not have found that he had

the required intent because he did not personally have any knowledge of the contents of the IRCs

and because he was not the preparer of those documents.

A court reviewing a jury's determination of intent should be cognizant that  "the question

of intent is generally considered to be one of fact to be resolved by the trier of the facts,"

meaning "the determination thereof should not be lightly overturned."  United States v. Hopkins,

357 F.2d 14, 18 (6th Cir.1966).  The Third Circuit has noted the difficulty in proving intent by

direct evidence, and noted the need to rely, in many cases, on "a series of seemingly isolated acts

and instances which have been rather aptly designated as badges of fraud."  United States v.

Vandersee, 279 F.2d 176, 179 (3d Cir. 1960).  Though such isolated acts may seem innocuous

standing alone, they may, in the aggregate, properly support a jury finding of fraudulent intent.

Id.  In the context of the wire fraud statute, the Sixth Circuit has noted that the government must

show the defendant's specific intent to induce the victim of the fraud to part with property or

undertake an action that he would not otherwise do absent the misrepresentation or omission.

United States v. DeSantis, 134 F.3d 760, 764 (6th Cir.1998).  The Ninth Circuit has held that the

required intent under the bank fraud statute is satisfied by a showing that the defendant intended,

through the use of material misrepresentations, to induce the victim to accept a substantial risk

that otherwise would not have been taken.  United States v. Benny, 786 F.2d 1410, 1417 (9th

Cir.1986).  An initial intent to repay a loan, therefore, does not preclude a conviction for

fraudulent acts when those acts are undertaken after the receipt of the loan proceeds and expose

the bank to a greater risk of loss.  Id. ("While an honest, good-faith belief in the truth of the

misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid

and will sustain no loss is no defense at all."); see also United States v. Hollis, 971 F.2d 1441,

1453 (10th Cir. 1992).

It is true that the ample and uncontradicted testimony at trial was that Defendant

originally entered into the Loan Agreement to procure funds to expand his retail business and

without the intention to financially destroy his companies.  Kiehne 1/18/05 at 12; Bercun 1/18/05

at 48, 50-51; Lori Bortnick 1/27/05 at 59-60; Ellis 1/19/05 at 44; Meingossner 1/27/05 at 182-83.

Testimony also revealed that the companies' financial troubles stemmed from mismanagement

of the retail business and other non-fraudulent reasons.  See, e.g., Bercun 1/18/05 at 44, 46, 48-

51; Shnayder 1/20/05 at 67-68.  While this may be so, it does not change the fact that there was

sufficient evidence at trial for the jury to find that Defendant knowingly and fraudulently made

misrepresentations to Congress in the IRCs in order to induce Congress to advance him more

loan money than that to which he otherwise would have been entitled.  This is sufficient

evidence of intent under the standards announced in DeSantis and Benny.[12]

Defendant's argument regarding his non-involvement in the preparation of the IRCs is

similarly unavailing.  As the government notes, Defendant signed each and every one of the

IRCs at issue in this case.  Moreover, the jury heard testimony from several different witnesses,

including employees of the Defendant, that he was intimately involved in almost every aspect of

---

[12]        Defendant repeatedly argues that a mere breach of contract is not a predicate for a criminal conviction, but
rather the basis for civil liability.  While this is a correct statement of the law, see, e.g., United States. v. Kreimer,
609 F.2d 126, 128 (5th Cir. 1980), the government's presentation and proofs at trial were not about a mere breach of
contract.  The government's presentation in this trial aimed to show that Defendant engaged in a variety of acts, over
a sixteen month period, designed to induce Congress to providing his companies more money under the Loan
Agreement and to prevent Congress from recouping as much of the loan proceeds as was potentially available to it.
Such activities do not amount to a mere breach of contract, but a proper "scheme to defraud" under the mail and wire
fraud statutes.  Id. (stating that while the [mail fraud] statute does not reject all business practices that do not fulfill
expectations" but that it condemns "plans calculated to deceive").

his companies' operations and was the main point of contact and source of information for most, if not all, of the auditors, accountants, and consultants that testified for the government in this case.  Garvey 1/19/05 at 58-60; Mink 2/1/05 at 4, 46-47; Bonner 1/28/05 at 8, 86; Garland 1/20/05 at 11; Ellis 1/19/05 at 15,17; Shnayder 1/20/05 at 6-7; Dobrick 4/17/04 at 17-18; Meingossner 1/27/05 at 117, 118.  The government also introduced Defendant's testimony from the bankruptcy hearing in January of 2000, in which he states that one of his largest problems his tendency to micromanage and that he "ha[d] to have my hands into everything."  1/26/00 bankruptcy hearing testimony read to jury on 1/18/05.  Defendant appears to argue that because controller Greene testified that he prepared the inventory reports, Defendant is absolved from liability for any misstatements contained therein.  Greene 1/20/05 at 10-11.  Greene's testimony at trial, however, was that the amount of control exerted over Greene by the Defendant and his family did not permit him to act as a "traditional controller."  Id. at 4-5.  Other testimony offered at trial revealed that at least one other MGL employee who was very close to Defendant regarded Greene as a controller in name only and that Greene had to go through Defendant to get relevant information.  Shnayder 1/20/05 at 6.  Such testimony belies Defendant's argument that the government presented no evidence that he was involved with the creation and preparation of the IRCs.

Lastly, Defendant makes various arguments related to his disclosure of the various inventory items and transactions underlying the government's claims of inventory inflation and to the government's alleged failure to prove that he acted other than in good faith towards Congress.  This claim is unsupported by the entirety of the record, which contains numerous instances of behavior on the part of the Defendant designed to obfuscate.  The most egregious testimony on Defendant's behavior towards Congress came from his cousin, Alex Shnayder,

who testified that Defendant discussed with him his opinion that Congress auditor George

Dobrick was, at best, inaccurate in his counts of Defendant's inventory, in that Dobrick would

often assume that items were physically present without actually counting them.  Shnayder

1/20/05 at 26-28.  The effect of this counting method, of course, led to overstatements in

inventory levels.  According to Shnayder, Defendant instructed him to accompany Mr. Dobrick

during his December 1999 audit to write down and confirm Dobrick's inaccurate numbers. Id. at

29-30.  The purpose of this exercise, according to Shnayder was to make sure Defendant's

internal inventory numbers matched the numbers Congress was getting so that "the loan could

go on." Id. at 30.  Shnayder also testified that Defendant told him to count the fabric inventory

using a certain method in order to "inflate the value of the inventory."  Id. at 31.

A non-exclusive list of the testimony and evidence supporting a finding of Defendant's

fraudulent intent includes that underlying the jury's findings that Defendant made all of the

adjustments to the MGL, MGL Apparel, and Lorianna inventory accounts described above, as

well as the testimony from Mr. Schnayder and Mr. Bonner regarding Defendant's behaviors in at

the inception of Mr. Bonner's inventory audit in December of 1999.  This testimony included

Mr. Bonner's statements that, upon his arrival at MGL, Defendant promptly took a three week

vacation with his family, which, given Defendant's control over his operations and employees,

left Bonner without anyone to speak with about the business and literally locked out of the

majority of the business's offices.  Bonner 1/28/05 at 6.  Bonner also testified that his issues

were compounded by Defendant's instructions that Bonner not distribute any MGL documents to

anyone but Defendant and his counsel. Id. at 6-7.  Moreover, Mr. Shnayder testified that

Defendant asked him to help obstruct Mr. Bonner's investigation by instructing one of

Defendant's computer people to slow down his provision of information to Bonner, by informing

the MGL warehouse manager that she was about to be let go and that she should look for another

job, and by generally making it difficult for Bonner to get information, Shnayder 1/20/05 at 43-

45.  All of this testimony supports a rational jury inference that Defendant had knowingly made

false representations to Congress regarding his true inventory levels.

The Renewed Motion for Judgment of Acquittal on Counts One through Eighteen (Doc.

No. 324) is therefore denied.

## V.     MONEY LAUNDERING IN VIOLATION OF 18 U.S.C. § 1957

The jury convicted Defendant of two counts of money laundering in violation of 18

U.S.C. § 1957.  At trial, the government argued that Defendant negotiated two checks from his

personal checking account to purchase a house in Hollywood, Florida and that the funds

underlying the checks were derived from the ongoing fraudulent activities directed at Congress

by Defendant.  Defendant argues that the money laundering verdicts must be overturned because

the government failed to prove (1) the underlying criminal activity – bank and wire fraud – and

(2) that the Defendant knew the negotiation of the checks involved criminally derived property.

The government argues that the evidence at trial was sufficient to prove the underlying bank and

wire fraud and that Defendant's knowledge of the origin of the funds can be inferred from his

involvement in the underlying criminal activity.  The Court has addressed the sufficiency of the

evidence on the bank and wire fraud convictions above, finding the guilty verdicts on those

counts to be supported.  Therefore, the Court will address only Defendant's arguments related to

his knowledge that the checks involved property derived from criminal activity.

To support a money laundering conviction, the government is required to show that "(1)

the defendant engage or attempt to engage (2) in a monetary transaction (3) with criminally

derived property that is of a value greater than $10,000 (4) knowing that the property is derived

from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity." United States v. Sokolow, 91 F.3d 396, 408 (3d Cir. 1996) (quoting United States v. Johnson, 971 F.2d 562, 567 n.3 (10th Cir.1992)).  While the government must prove that Defendant knew that the property used in the transaction was criminally derived, it is not required to prove that Defendant knew the money laundering transaction itself was illegal.  Id.

In Sokolow, the Third Circuit addressed the proof required where an accused engages in a transaction by drawing funds from a pool of money that contains funds both criminally and legitimately derived.  The Court held that section 1957 does not require the government to "trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources." Sokolow, 91 F.3d at 409 (citing United States v. Moore, 27 F.3d 969, 976 77 (4th Cir.1994) ("Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly acquired funds and the legitimately acquired funds . . . cannot be distinguished from each other. . . .").  That the overall pool of assets might also contain funds from legitimate sources is therefore irrelevant.

The jury was presented with sufficient evidence at trial to conclude that the Defendant wrote two checks to pay for his new home in Florida, and that the funds underlying those checks were, in whole or in part, the proceeds of his fraudulent activities.  The jury heard testimony that, after Defendant entered into the loan transaction with Congress, the salary he derived from MGL was increased by $30,000 per month to $50,000 per month for the remainder of 1998.  Id. at 65; Gov't Ex. ADP-1.  Timothy Dudek, a Kreischer Miller tax preparer assigned to the MGL and UNICOM accounts, testified that, in 1999, the Defendant and his wife, Hannah, received approximately $500,000 in salary and other distributions from MGL.  Dudek 2/2/05 at 12; Gov't Exs. Sendek1, Sendek2; IRS11.  MGL records showed a distribution of $45,000.00 each to

Defendant and his wife on April 14, 1999. Gov't Ex. JC-1(c).  The jury also heard testimony that that Defendant and his wife maintained a Performance Checking Account at First Union Bank, into which their salaries from MGL were deposited.  Sendek 2/1/05 at 61.

The testimony at trial was that Defendant paid cash for his $753,960 Florida home, at least in part, with the wages paid to himself and his wife Hannah by MGL.  The first of these checks was in the amount of $68,500 and was negotiated on September 10, 1999; the second check was in the amount of $670,000 and was negotiated on December 1, 1999.  Sendek 2/2/05 at 48-50; Gov't Ex. Harbor1; Sendek1.  The testimony and evidence at trial showed that the first check was drawn directly from the Performance Checking Account at First Union, while the second check was drawn from two different accounts at Wilmington Trust of Pennsylvania. Gov't Ex. Sendek1. With respect to the funds used to negotiate the second check, the jury heard testimony that Defendant written a check in the amount of $670,000 from the First Union account on December 1, 1999 and deposited those monies in the Wilmington Trust account, which was then used to write a check in the amount of $667,147 to pay for the remainder of the house in Florida. Sendek 2/2/05 at 50, Gov't Ex. Sendek1.

All of the above evidence was sufficient to support the series of inferences necessary for a jury finding of guilt on the money laundering counts — that the fraudulently obtained monies from Congress flowed from MGL to Defendant's First Union bank account by way of the salaries paid to himself and his wife, that the checks written on that account were funded, in whole or in part, by the tainted salary monies, and that the checks were used to purchase the Defendant's house in Hollywood, Florida.  As such, Defendant's Renewed Motion for Judgment of Acquittal on Counts Twenty-Six and Twenty-Seven (Doc. No. 323) is denied.

## VI.   PRE-BANKRUPTCY TRANSFER OR CONCEALMENT OF PROPERTY IN VIOLATION OF 18 U.S.C. § 152(7)

At trial, the jury found Defendant guilty of violating Section 152(7) by transferring $1 million in MGL assets, specifically fabric, to UNICOM prior to the commencement of bankruptcy proceedings.  Section 152(7) applies to "[a] person who . . . in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation . . . ." 18 U.S.C. § 152(7).  The government's theory at trial was that the Defendant completed a transfer of assets to UNICOM, a company that he partially controlled, in December of 1999, only one month before MGL filed for bankruptcy and that Defendant hid these transfers by making two sets of adjustments to his accounting records.

Defendant has moved for a judgment of acquittal on Count Nineteen on two grounds. First, the Defendant argues that the testimony of Lori Bortnick and Arnold Resnick clearly shows that the fabric at issue was transferred to UNICOM in repayment of legitimate debt. Second, the Defendant argues that the testimony at trial established that the December 1999 transfers were not concealed from Congress or the Trustee and that Defendant therefore lacked the requisite fraudulent intent.

The government argues that the jury was presented with evidence from which they could reasonably conclude that MGL did not owe a significant debt to UNICOM and that the debt allegedly repaid to UNICOM was actually a debt owed to a company called Polytex.  The government cites to the testimony of Ms. Picnic and Messrs. Meingossner, Dudek, and Coffey in support of this contention.  The government also argues that the jury could have inferred the required fraudulent intent from the evidence presented at trial regarding the manner in which Defendant disclosed the debt to Mink, Bonner, and Dobrick; Defendant's failure to report the

transfers of fabric to UNICOM on the MGL bankruptcy schedules (the basis for Count Twenty-Two); the nature of the relationship between the Defendant and UNICOM; and the manipulations of the MGL records to conceal the timing of the transfers as well as the true amount of debt owed by MGL to UNICOM at the inception of 1999.

A.     A Reasonable Jury Could Have Found That the Transfers Were Not A Repayment of A Legitimate Debt.

At trial, Lori Bortnick, who is the Defendant's mother and who was the bookkeeper for UNICOM, Polytex, MGL, and two other of Defendant's companies, testified that MGL had a loan outstanding with UNICOM that it paid in fabric and currency, and that there such a loan would have still been outstanding during 1998 and 1999.  Id. at 73. For his part, Mr. Resnick testified that his business, Resnick Textile, sold most of the fabric that MGL produced and imported to the United States.  1/25/05 Tr. at 3.  Mr. Resnick testified that, in January of 2000, the Defendant told him that MGL had transferred inventory to UNICOM to pay off a debt that MGL owed to that company.  Id. at 11.  The Defendant then asked Mr. Resnick to sell the fabric that had been transferred to UNICOM.  Id.

The jury also heard testimony, however, that would support a reasonable jury's finding that the shipments of fabric were not in repayment of a legitimate debt. Karl Meingossner, the accountant assigned to the MGL account at Kreischer Miller, MGL's accounting firm, testified that his tax return work papers for MGL showed a loan payable to UNICOM as of December 31, 1998 in the amount of $300,000.  1/27/05 at 132; 1/28/05 at 41.  Timothy Dudek testified that the 1998 corporate tax returns he prepared  for UNICOM listed the payable owed to UNICOM by MGL as $300,000, confirming the number reported by Meingossner.  Id. at 205-06.  The jury also heard the testimony of forensic accountant Daniel Coffey, who testified that his review of auditor Marianne Picnic's work papers revealed the MGL's debt to UNICOM was reduced to

$180,000 over the course of 1999 by a series of twelve checks, each in the amount of $10,000, were written throughout 1999. Coffey, 2/7/05 Tr. at 158-60.  Thus, a reasonable jury could have found that the debt owed by MGL to UNICOM was only $300,000 at the beginning of 1999 and was reduced to $180,000 by December of 1999, the point at which Defendant shipped $1 million in fabric to that company, and that the shipment of fabric far in excess of the amount actually owed UNICOM was therefore not in repayment of a legitimate debt.

Given the above evidence, it is clear to the Court that a reasonable jury could have found that the transfer of over $1 million in fabric to UNICOM was not the legitimate repayment of a debt, given the testimony and documentary evidence indicating that, during the relevant time period, MGL's debt to UNICOM never exceeded $300,000 and was, as the result of the twelve checks, reduced to $180,000 by the end of 1999.

B.      A Reasonable Jury Could Have Found That Defendant Acted With Fraudulent Intent

The plain language of 152(7) requires that the government prove beyond a reasonable doubt that a defendant "knowingly and fraudulently transfer[] or conceal[]."  18 U.S.C. 152(7). As stated above, a government may show that a defendant acted knowingly and fraudulently from circumstantial evidence, including, for example, a temporal proximity between the concealment or transfer and the filing of bankruptcy; the opportunity to use and possess the assets after the transfer; knowledge of weakened financial status of the bankrupt entity at the time of the transfers; the failure to disclose the transfer of assets on the bankruptcy petitions; and the falsification of company records to disguise the transfers.  See, e.g., United States v. Shadduck, 112 F.3d 523, 525-26 (1st Cir. 1997) (holding that temporal proximity and failure to disclose assets on bankruptcy petitions was sufficient for inference of intent to conceal pre-bankruptcy transfer); United States v. McClellan, 868 F.2d 210, 216 (7th Cir. 1989) (holding transfer of vehicles to father two months prior to bankruptcy with access to cars post-transfer sufficient to support inference of fraudulent intent); United States v. Weichert, 783 F.2d 23, 25 (2d Cir. 1986) (holding that diversion of assets immediately prior to conversion of bankruptcy proceeding and appointment of a trustee is sufficient for inference of required intent); United States v. Martin, 408 F.2d 949, 953-54 (7th Cir. 1969) (holding that, among other things, concealment of true nature of transfers in company records and knowledge of company's poor financial health at time of transfer sufficient for inference of intent); United States v. Heavrin, 144 F. Supp. 769, 773 (W.D. Ky. 2001) (holding "reasonable inference of intent flows naturally" from debtor's failure to disclose assets on bankruptcy petition).  The jury in this case heard more than enough testimony to establish that Defendant had the required fraudulent intent.

To begin, the testimony that the jury heard about the timing and the size of the transfer,

provided circumstantial evidence of a fraudulent intent.  According to Henry Armendinger, the owner of Distribution Experts, the fabric shipments at issue began in early December 1999 and continued until December 16, 1999.  Armendinger 1/20/05 at 2-9.  MGL warehouse manager Mitchell Garland confirmed the timing of the shipment in his testimony to the jury and through the introduction into evidence of the bills of lading he created at the time of the shipments Garland 1/20/05 at 24; Gov't Exs. DE1- DE13.  John Bonner testified that he arrived at MGL on December 16, 1999, the date of the last fabric shipment to UNICOM.  Bonner 1/28/05 at 4-5.  Bonner also testified that Congress had required Defendant to bring in a "turnaround" consultant because MGL had run out the ability to finance its operations and was, in his words, "up against the wall."  Id. at 4, 7.  As to the size of the shipment, Garland testified that it was "enormous" relative to previous fabric shipments; MGL employee Ken Halpern, who managed the logistical aspects of the transfer also testified to its unusual size.  Garland 1/20/05 at 21; Halpern 1/21/05 at 8.

In addition, the testimony before the jury was sufficient to support a finding that the Defendant's transfers of fabric to UNICOM were self-dealing.  Though UNICOM was nominally owned by an individual named Albert Petichinsky, various professionals and employees of Defendant with reason to interact with UNICOM testified repeated that they had no interaction with Mr. Petichinsky but instead interacted with Defendant.  Such testimony came from Mr. Resnick, who was charged with selling the transferred UNICOM fabric by Defendant, Timothy Dudek, the tax preparer assigned to the MGL and UNICOM accounts, Ken Halpern, an MGL employee who also did work for UNICOM.  Halpern, 1/21/05 at 6; 2/1/05 Tr. at 201, 203, 205; 1/25/05 Tr. at 12.  The jury also heard testimony that UNICOM's address and sole place of business was identical to the address of MGL, that Defendant was listed as an officer of

47

UNICOM on that entity's 1998 corporate tax returns, that Defendant's mother kept the books and records of UNICOM at MGL's Trevose, Pennsylvania office, and that Defendant's auditors recognized MGL and UNICOM as internally related parties based on Defendant's common control over the companies. Halpern 1/20/05 at 6, 9; 2/1/05 Tr. at 201, 203, 205; Laurie Bortnick 1/27/05 Tr. at 39-40, 62; Meingossner, 1/27/05 at 24-25. This testimony, when combined with the timing and size of the fabric transfer, certainly would provide a basis for a finding of fraudulent intent.

Moreover, the jury heard evidence that the Defendant attempted to conceal these transfers by altering his books and records. As stated above, Mr. Coffey testified that he eventually became aware that the MGL computer system had two sets of records on it – a "main computer" and a "restored computer."[13] According to Coffey, the main computer did not show any transfers of fabric to UNICOM in December of 1999, but showed such transactions as having occurred between January and October of 1999; these latter transactions bore the bills of lading numbers created by Garland in December of 1999. Coffey 2/7/05 at 141-143, 150. After Defendant's attorney directed Coffee to the restored version of the MGL computer, Coffey discovered that the restored computer, which had been backed up on November 17, 1999, did not show the January through October transactions at all. Id. at 142-143. Coffey also testified that his comparison of the main and restored computer files revealed that purchases that appeared to have been made by MGL from UNICOM on the main computer were reflected on the restored computer as purchases made by MGL from Polytex. Id. at 147. Coffey testified that the effect of this "flipping" was to create the appearance of a payable to UNICOM in excess of $1 million

---

[13]     The jury also heard testimony at trial that Defendant's first business endeavor was in the field of computer programming and that he had a great deal of expertise in that area. Lori Bortnick 1/27/05 at 54.

on the main computer.[14]  This debt then appeared to be paid down by the January to October

1999 transfers of fabric listed on the main computer.  Id. at 150.

The evidence presented at trial with respect to the timing of the transfers, the Defendant's

interest in transferee UNICOM, and the various attempts to conceal the timing and purpose of

the transfers, and, in addition, Defendant's failure to disclose the transfers on the MGL

bankruptcy filings in the face of specific questions regarding the transfers of assets prior to

bankruptcy, was sufficient to support the jury's verdict on Count Nineteen.  The testimony cited

by Defendant for the proposition that the transfers were not concealed because of their disclosure

to various individuals, including the bankruptcy Trustee, does not change this conclusion.  For

example, the testimony of John Bonner, the bankruptcy trustee, demonstrates only that Bonner

found Halpern's instructions for the UNICOM shipments in December of 1999, but did not

understand what it meant until 400,000 yards of fabric were found at a New Jersey warehouse in

the fall of 2000.  Bonner 1/28/05 at 55, 60.  Though the Defendant cites to the testimony of

George Dobrick for the proposition that Dobrick knew of the transfers, Dobrick in fact testified

that he had no knowledge of any transfers of fabric to UNICOM at the time the transfers took

place in 1999; Dobrick testified that he became aware of the fabric transfers in February of

2000,[15] after he asked for and received the bills of lading from Defendant.  Dobrick 4/7/04 at

107, 188-191.

As such, Defendants Renewed Motion for Judgment of Acquittal as to Count Nineteen

(Doc. No. 318) is denied.

### III.    FALSE CLAIM IN BANKRUPTCY IN VIOLATION OF 18 U.S.C. § 152(3)

---

[14]      As discussed briefly above, Coffey also testified that the work papers and tax returns for MGL, Polytex,
and UNICOM for the relevant time periods all reflected that a large debt was owed by MGL to Polytex and not to
UNICOM.  Coffey 2/7/05 at 157-59.

[15]      Bonner testified that he "almost threw [the instructions] out" but kept them because they were the only
document he could find in his exhaustive search of the Trevose warehouse.  Bonner 1/28/05 at 60.

Defendant challenges the jury's finding of guilt on Counts Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Four, the counts related to various statements and omissions made on the bankruptcy filings for MGL, MGL Apparel, and Lorianna. 18 U.S.C. § 152(3) applies to one who "knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11." 18 U.S.C. § 152(3).  In order to support a conviction for bankruptcy fraud under § 152, the prosecution must prove, beyond a reasonable doubt, (1) the existence of bankruptcy proceedings, (2) that the defendant made a statement in the bankruptcy proceedings under penalty of perjury, (3) that the statement was false, (4) that the statement was material, and (5) that the statement was made knowingly and fraudulently.  United States v. McCormick, 72 F.3d 1404, 1406 (9th Cir. 1995).

Defendant alleges that the government failed to meet its burden with respect to each of the counts at issue on several different grounds.  First, Defendant levels two uniform challenges to all four counts – that he lacked sufficient criminal intent and that he had no participation in the creation of the various bankruptcy filings at issue.  Second, Defendant argues that the bankruptcy filings did not contain any false statements and that the jury unreasonably found the omissions and inclusions underlying Counts Twenty-One through Twenty-Four to be fraudulent. With respect to Count Twenty-Three, Defendant makes the additional argument that the inaccurate inventory amounts included on the MGL Apparel petition were not material.  The Court will first address Defendant's count-specific objections to the jury's findings, then proceed to the arguments related to Defendant's intent, which are common to all four counts.

A.      A Reasonable Jury Could Have Found That the Inventory Amounts Reported for MGL,
        MGL Apparel and Lorianna on the Inventory Schedules Were False.

The jury found Defendant guilty of Counts Twenty-One, Twenty-Three, and Twenty-Four, which charged him with making a false declaration in bankruptcy on behalf of MGL, MGL Apparel, and Lorianna, respectively.  The government's allegation in each of these counts was that Defendant knowingly reported an inflated amount of inventory on Schedule B of the bankruptcy fillings for each of his companies -- $6,915,144 in inventory for MGL, $4,001,339 for MGL Apparel, and $13,303,553 for Lorianna.  Defendant argues that the evidence at trial was insufficient to show that the inventory amounts that appeared on Schedule B were inflated. The government argues in response that the evidence was sufficient to convict, as the inventory amounts reported on the various Schedule Bs were identical or almost identical to those reported on the December 20, 1999 IRC sent to Congress, which the jury found to be fraudulently inflated.

A comparison of the inventory amounts reported to Congress in December of 1999 and the inventory amounts listed on the three bankruptcy schedules resolves the instant question in favor of the government.  The evidence at trial was that the amount listed on Schedule B for MGL was only $49,000 less than the amount listed on the December 20, 1999 IRC submitted to Congress; the amount listed on Schedule B for MGL Apparel was identical to that reported to Congress in December 1999; and the amount reported on Schedule B for Lorianna was only $7,499 less than that reported on the December 20, 1999 inventory report for Lorianna.  As discussed above, the jury heard evidence that was sufficient to find that the inventory amounts on the December 20 IRC were fraudulently inflated.  Given that the jury's finding on the falsity of the inventory numbers reflected on the December 20, 1999 IRC was supported by the record

at trial, the finding that the nearly identical inventory numbers that appear on Schedule B is likewise supported by the record.

### C.  A Reasonable Jury Could Have Found That Defendant Failed To Disclose the December 1999 Transfers of Fabric to UNICOM in the MGL Bankruptcy Filings.

The jury found Defendant guilty of Count Twenty-Two, which charged him with making a false declaration in bankruptcy on behalf of MGL Corporation by (1) failing to disclose, in response to Question 3(a) on the Statement of Financial Affairs, payment of a debt to UNICOM when Defendant knew that MGL had repaid approximately $180,000 to UNICOM within the 90 days preceding the commencement of bankruptcy; (2) failed to disclose, in response to Question 3(b) on the Statement of Financial Affairs, that MGL had transferred 868,000 yards of fabric to UNICOM within a year preceding the commencement of bankruptcy; and failed to disclose, in response to Question 10 on the Statement of Financial Affairs, that MGL had transferred 868,000 yards of fabric to UNICOM within a year preceding the commencement of bankruptcy.

Defendant does not dispute that the transfers of money and fabric to UNICOM were not disclosed on the MGL Statement of Financial Affairs, but disputes that the government presented sufficient evidence that he failed to disclose these transfers with the required criminal intent.  Moreover, Defendant claims that, because he did not assist in the preparation of the Statement of Financial Affairs, he cannot be held criminally responsible for the omissions of his accountants and attorneys.  The latter argument will be addressed below.

The jury heard testimony from accountant Daniel Coffey that the manipulations to the MGL computer system made it appear that the December transfers of fabric had happened twelve to three months earlier and that they were undertaken to pay a debt to UNICOM that had previously been accounted for as being owed to Kortex.  Coffey testified that the effect of these changes was to make the transfers less noticeable, meaning that the transfers of fabric appear to

be slowing diminishing over the course of a year, rather than having taken place in a lump sum within 90 days of the bankruptcy filing.  Coffey at 150-151, 160.  A reasonable jury could have coupled this testimony with Defendant's complete failure to disclose the transfers as having occurred within the year prior to bankruptcy, and concluded that he knowingly and fraudulently failed to disclose the transfers of fabric to UNICOM on the MGL Statement of Financial Affairs.

C.    A Reasonable Jury Could Have Found That the Four Payables Reported on the MGL Apparel Bankruptcy Schedules Were Fabricated Or Inflated.

As stated above, the jury found Defendant guilty of Count Twenty-Three, which charged him with making a false declaration in bankruptcy on behalf of MGL Apparel by making five separate misrepresentations: (1) reporting on Schedule B that MGL Apparel had $4,001,339 in inventory, when he knew that amount was inflated; (2) reporting on Schedule F that creditor Check Seal had $2,012,322 in claims against MGL Apparel, when he knew that amount was inflated; (3) reporting on Schedule F that creditor Kaluzhanka Sewing Factory ("Kaluzhanka") had $497,102 in claims against MGL Apparel, when he knew that amount was inflated; (4) reporting on Schedule F that creditor Spetzemexport had $2,783,296 in claims against MGL Apparel, when he knew that amount was inflated; and (5) reporting on Schedule F that creditor Volga Sewing Factory ("Volga") had $159,784 in claims against MGL Apparel, when he knew that amount was inflated.  As Defendant's claim with respect to the inventory misrepresentation was resolved above, this section will focus only on Defendant's claims as to the four allegedly false payables.

1.    *A reasonable jury could have found that the four payables were inaccurate or fabricated.*

Defendant argues that the government did not present any evidence at trial that the four payables to Check Seal, Kaluzhanka, Spetzemexport, and Volga were inaccurate and that

Defendant's disclosure of the debts to Karl Meingossner and Albert Mink forecloses any conclusion that Defendant acted with the required criminal intent. The government claims that a reasonable jury could have found that the amount of payables listed on Schedules B and F of the bankruptcy filings for the three companies were inaccurate and/or fabricated and that the Defendant reported these false payables knowingly and fraudulently. The government also relies on the testimony of Karl Meingossner, as well as that of Dmitri Popov of Check Seal, Dan Coffey, George Dobrick, Al Mink, and Timothy Dudek.

Karl Meingossner, who spent eighty hours in January of 2000 examining the books and records of Defendant's companies at the behest of Phoenix Management, testified that Defendant only presented him with a list of the four payables at issue after his review resulted in an inventory valuation of approximately $15 million for all three companies, a number that was $8 million less than Defendant's last reported inventory amounts to Congress in December of 1999. Meingossner 1/27/05 at 144-147. Meingossner also testified that the new list of payables, which were not currently on the books and records of the three companies, were supposed to represent additional inventory. Id. at 147-50. Though Meingossner asked Defendant for support for these figures, Defendant never provided any. Id. at 149. Mink also testified that Defendant gave him the same list of payables and told him that they weren't reflected in the companies' accounts payable system and needed to be added manually. Mink 2/1/05 at 49-51.

The jury in this case heard testimony from several different witnesses that no debt existed in January of 2000 from MGL to Check Seal or Spetzemexport. Dmitri Popov, of Check Seal, testified that, in 1998 and 1999, Check Seal had no outstanding contracts with MGL and more importantly, that Check Seal was not owed a debt of $2.1 million, or of any amount, in January of 2000 by either MGL or MGL Apparel. Popov 1/28/05 at 7-9. Popov's testimony was

corroborated by the work papers of Dudek, who testified that they did not reflect any debt owed by MGL or MGL Apparel to Check Seal in 1999,as well as the testimony of Picnic, Dobrick, and Coffey.  Dudek 2/1/05 at 214; Picnic 1/21/05 at 23; Coffey 2/8/05 at 21-28; Dobrick 4/7/04 at 37, 40-41, 52, 86-87.  Dobrick, Picnic, and Coffey also testified that their independent reviews of the MGL and MGL Apparel books and records never revealed an existing debt from those entities to Spezemexport.  Dobrick 4/7/04 at 37, 40-41, 52, 86-87, Picnic 1/21/05 at 23; Coffey 2/8/05 at 21-28.  Mr. Coffey testified that he specifically searched for information regarding such debts after seeing them listed on the 1999 Kreisher Miller work papers without any supporting information.  Coffey 2/8/05 at 21.  With respect to the debts to Kaluzhanka and Volga, the jury heard testimony from Meingossner that the figures provided him by Defendant represented a brand new debt in the amount of $497,102 to Kaluzhanka and an additional $ 87,000 in debt to Volga.  Meingossner 1/27/05 at 147-48.

The above testimony is sufficient for a jury to conclude that the Defendant fabricated the four payables, then signed a bankruptcy filling listing the four debts as actually due his three companies.  Though the government's direct evidence on the new debts to Kaluzhanka and Volga was sparser than that with respect to the new debts to Check Seal and Spetzemexport, the government argues, and this Court agrees, that a reasonable jury could have concluded that they were false as well, based on the testimony and work papers and Meingossner and Defendant's provision of those debts to Meingossner and Mink in a single transaction.

     2.    *A reasonable jury could have found that the misrepresentations as to the four payables were material.*

The Defendant also argues that the jury's conviction cannot stand because neither the inflated inventory amount nor the $5,548,504 in reported payables to Kaluzhanka, Volga, Check Seal, and Spetzemexport was not a "material" misrepresentation.  The government argues that the misrepresentations are in fact material, both in terms of sheer amount and in the effect the misrepresentations had on the bankruptcy process.

Though the explicit language of 152(3) does not require that the misrepresentation be material, courts have imposed this requirement.  See United States v. Yagow, 953 F.2d 427, 432 n.2 (8th Cir. 1992) (citing United States v. O'Donnell, 539 F.2d 1233, 1237 (9th Cir. 1976).  The question of materiality in a bankruptcy fraud case is a matter of law and this Court reviews the question de novo.  United States v. Lindholm, 24 F.3d 1078, (9th Cir. 1994) (citing United States v. Key, 859 F.2d 1257, 1261 (7th Cir. 1988); United States v. Clark, 918 F.2d 843, 845-46 (9th Cir. 1990).  The Ninth Circuit has defined materiality to include: (1) matters relating to the extent and nature of the bankrupt's assets; (2) inquiries relating to the bankrupt's business transactions or his estate; (3) matters relating to the discovery of assets; (4) the history of a bankrupt's financial transactions; and (5) statements designed to secure adjudication by a particular bankruptcy court.  Lindholm, 24 F.3d at 1083 (citing United States v. O'Donnell, 539 F.2d 1233, 1237-38 (9th Cir.), cert. denied, 429 U.S. 960 (1976)).  Other courts that have considered the issue have adopted this definition or one similar to it in breadth.  See United States v. Gellene, 182 F.3d 578, 587-88 (7th Cir. 1999); Yagow, 953 F.2d at 433; United States v. Sabbeth, 125 F. Supp. 2d 33, 43-44 (E.D.N.Y. 2000).  The issue of materiality is "readily established" and a misrepresentation need not harm a creditor to be material.  Sabbeth, 125 F. Supp. 2d at 44 (citations omitted).

It is clear that the statements regarding the inventory and debt levels for MGL Apparel are material under this broad definition of that term.  Defendant argues that the payables were only a tiny part of the total liabilities that MGL Apparel reported on its bankruptcy petition and that their presence on Schedule F had no financial effect on Congress, the only secured creditor, because none of the unsecured creditors received any funds from the bankruptcy estate.  With respect to the inventory valuation, the Defendant argues that there was no indication of the total dollar amount by which the inventory number was inflated.  As seen above, however, the "materiality" of a misrepresentation does not depend solely on its sheer amount, or size relative to the total bankruptcy estate.  Nor does materiality ride on the impact a misrepresentation has on investors.

The misrepresentations made here by Defendant were material.  With respect to his inventory, the statements related to the nature and extent of the MGL Apparel estate, as well as to the discovery of assets.  The record at trial was clear that the search for the true amount of inventory held by Defendant's companies, including MGL Apparel, was extensive and required a considerable amount of manpower on the part of the Trustee and others.  The misrepresentations regarding the amount of debt owed to Check Seal, Kaluzhanka, Spetzemexport, and Volga related to the history of MGL Apparel's financial transactions, as well as to the amount and valuation of inventory held by that company.[16]  In addition, at trial, Trustee John Carroll explained the effect of a bankruptcy filing containing additional unsecured creditors.  He explained that an overstatement of a company's debt lessens the amount to which other creditors are entitled.  In addition, Carroll testified that in cases like Defendant's, where the additional debts were allegedly undertaken to procure more inventory, the debt is typically factored into the cost of goods sold; therefore, an overstatement of debt would lead a Trustee to miscalculate costing information, which causes the inventory valuation to be incorrect as well.  Carroll 2/1/05 at 201.  It is clear that the misrepresentations at issue are "material" as a matter of law.

---

[16]     As explained above, Defendant cited these debts as representing additional inventory not found by Karl Meingossner in his audit.

E.       Defendant's Involvement in the Preparation of the Bankruptcy Filings

Defendant argues that his involvement with the petitions and schedules was limited to signing the petitions and the last declaration pages submitted with the bankruptcy schedules and that these signatures are insufficient to prove that he committed bankruptcy fraud.  In support of this contention, Defendant cites to United States v. White, 879 F.2d 1509 (7th Cir. 1989) and United States v. McCormick, 72 F.3d 1404 (9th Cir. 1995).  These cases, however, do not support Defendant's argument that a reasonable jury in the instant case could not have found Defendant guilty of bankruptcy fraud.

In White, the Seventh Circuit upheld the bankruptcy fraud conviction of the principal of a corporation who fraudulently concealed assets from the bankruptcy trustee, but reversed the conviction of his wife, on the theory that the appearance of her signature on the bankruptcy filings was insufficient to support her conviction.[17]  The Seventh Circuit noted that "proof of signature alone . . . is insufficient by itself to make knowledge of the contents . . . attributable to the signer" but that "the signature is prima facie evidence that the signor knows the contents." White, 879 F.2d at 1511 (citations omitted).  The Court went on to state that the issue in such a case is whether the total circumstances, including the fact that the defendant signed the document containing the fraudulent statement, supports a finding that he knew the contents of what he was signing.  The Court upheld the husband's conviction based on his meeting with bankruptcy counsel prior to the filing of the documents, his status as a businessperson who handled all the financial affairs of his household, and his understanding that he would have to meet with his creditors and be examined under oath as to the veracity of his statements.  Id.

The documents at issue in Counts Twenty-One through Twenty-Four are, respectively, the MGL Corporation bankruptcy Schedule B, the MGL Corporation Statement of Financial Affairs, MGL Apparel bankruptcy Schedules B and F, and Lorianna Stores bankruptcy Schedule B.  The testimony at trial supports Defendant's contention that he did not personally prepare these documents – both John Bonner and Albert Mink testified that the law firm that represented MGL, MGL Apparel, and Lorianna prepared the petitions and schedules at issue in Counts Twenty-One through Twenty-Four.  The government argues, however, that the additional evidence adduced at trial is sufficient to support a reasonable jury's finding that Defendant knew the contents of the filings – his signature on the pleadings, his involvement in the bankrupt companies, and his participation in meetings and phone calls regarding the contents of the bankruptcy pleadings before and after their filings.

For many of the same reasons articulated by the Seventh Circuit in White, the Court finds that a reasonable jury could find that Defendant knew of the contents of the bankruptcy pleadings.  To begin, Defendant's signature is present on the statement of financial affairs and the schedules for each company.  Gov't Exs. JC 1(b) at 28, JC 2(b) at 84, JC 3(b) at 57, JC 1(c) at 4, JC 2(c) at 4, JC 3(c) at 4. On the statements of financial affairs, his signature appears below a statement that he declares "under penalty of perjury that I have read answers contained on the foregoing statement of financial affairs and any attachments thereto," while his signature of the schedules appears under a statement that he declares " under penalty of perjury that I have read the foregoing schedules."  In both instances, Defendant swore under penalty of perjury that

---

[17]       The facts in McCormick are virtually identical and will not be discussed.  In that case, the Ninth Circuit reached the same conclusion – upholding the husband's conviction and reversing the wife's – using the standards laid out by the Seventh Circuit in White.

the information contained therein was "true and correct to the best of [his] knowledge, information and belief."

As discussed above, there was sufficient testimony for the jury to find that Defendant knew about the content of the IRCs being submitted to Congress because of his intimate involvement in almost every aspect of his business. That same testimony supports a reasonable jury finding that Defendant was aware of the content of his bankruptcy filings. In addition, there was evidence, introduced during the testimony of Mr. Mink, that Defendant was in frequent communication with his bankruptcy counsel regarding a variety of topics, including the schedules and statements of financial affairs. Mink 2/1/05 at 160, Def. Ex. Bonner 86. As such, Defendant's argument of ignorance as to the content of his bankruptcy filings does not mandate a reversal of his conviction.

Therefore, the renewed motions for judgment of acquittal as to Count Twenty-One (Doc. No. 319), Count Twenty-Two (Doc. No. 322), Count Twenty-Three (Doc. No. 320), and Count Twenty-Four (Doc. No. 321) are denied.

## IV.    CONCEALMENT OF PROPERTY OF DEBTOR IN VIOLATION OF 18 U.S.C. § 152(1)

At trial, the jury found Defendant guilty of violating Section 152(1), prohibits

"knowingly and fraudulently conceal[ing] from a custodian, trustee, marshal, or other officer of

the court charged with the control or custody of property, or, in connection with a case under

title 11, from creditors or the United States Trustee, any property belonging to the estate of a

debtor." 18 U.S.C. § 152(1). The conduct underlying Defendant's conviction was the transfer of

approximately $135,042 to an account at the Bank of Cyprus in February of 2000, in the midst of

the MGL bankruptcy proceedings. Though Defendant's business partner, Arnold Resnick, made

the actual transfer, the government argued to the jury that the money was the property of MGL

and therefore the MGL bankruptcy estate.

Defendant moves for acquittal on Count Twenty-Five on two grounds. First, he argues

that there was no evidence at trial that the $135,042 at issue was the property of MGL and that

the testimony of Arnold Resnick established that the money was his property. Second,

Defendant argues that judgment of acquittal is required because did not possess the required

fraudulent intent, as the assets transferred were not MGL's and as the evidence at trial

established that he revealed the transfer to John Bonner. The government argues that the

testimony of Resnick and John Bonner establish that the $135,042 was the property of the bankruptcy estate and that the testimony of John Bonner and documentary evidence introduced during his cross-examination were sufficient to allow the jury to make a finding of fraudulent intent.

Mr. Resnick testified before the jury that, he was the owner of A. Resnick Textile, which originally sold most of the fabric that MGL brought into the United States.  He testified that, in May 1999, he and the Defendant embarked on a new business relationship in which Resnick financed the garment operations of MGL and acted as MGL's broker in selling its garments to private label purchasers, including a company named Carol Wren.  Resnick at 5-7. Mr. Resnick further testified that, on February 22, 2000, he applied to his bank for a wire transfer in the amount of $135,042, to be sent to the Bank of Cypress.  Resnick 1/25/04 at 16.  He testified that he took this action at the behest of Defendant, who told him that the funds were monies owed to suppliers on the Carol Wren project, which had concluded in January of 1999.  Id. at 16, 30. The testimony of John Bonner was that Mr. Resnick would purchase garments from MGL, then deliver them to the private labels, which would sell the garments in their retail stores.  Bonner 1/31/05 at 30.  An exhibit introduced during Mr. Bonner's cross-examination showed that, on December 24, 1999, MGL was still owed $565,000 from A. Resnick for the Carol Wren transaction.  Def. Ex. Bonner 101.

While Defendant argues that the funds transferred by Resnick to the Bank of Cyprus were his own and not part of the $565,000 owed by his company to MGL at the end of 1999, that is but one conclusion that a reasonable jury could have reached.  First, as a matter of law, the diversion of a payable to a bankrupt entity has the effect of concealing an asset of a debtor in bankruptcy and therefore gives rise to criminal liability under § 152.  See, e.g., United States v.

Center, 853 F.2d 568, 571-71 (7th Cir. 1988).  Second, as a matter of fact, a reasonable jury viewing the evidence above could have concluded that Bortnick directed Resnick to transfer funds to the bank of Cyprus that rightfully belonged to the MGL bankruptcy estate as part of that $565,000 payable.  Under the Rule 29 standard, even where a defendant can present an innocent explanation for his actions, the question is whether the evidence, when viewed in the light most favorable to the government, is sufficient to support a conviction.  See Glasser v. United States, 315 U.S. 60, 80 (1942).

The Defendant also argues that his disclosure of the payments to Mr. Bonner negates a finding of criminal intent and therefore mandates that his conviction on Count Twenty-Five should be reversed.  The evidence cited by Defendant does not reflect that Mr. Bonner was told that Mr. Resnick would be transferring property of the MGL estate to the Bank of Cyprus in February 2000, but rather reflects disbursements that Mr. Bonner anticipated would be paid by MGL for labor, transportation, and customs related to the Carol Wren project in January 2000. See Def. Ex. Bonner-101.  This does not disprove the government's contention that the Defendant knowingly directed Mr. Resnick to transfer $135,042 that rightfully belonged to the MGL estate in February of 2000.

As such, the Renewed Motion for Judgment of Acquittal as to Count Twenty-Five (Doc. No. 317) is denied.

## V.    VERDICT OF FORFEITURE

Defendant moves to reverse the jury's verdict of forfeiture because the government failed to present evidence sufficient to sustain his underlying convictions for bank fraud, wire fraud, and money laundering.  For all the reasons articulated in the discussions of the jury's verdict on those counts, the Motion for Acquittal on Forfeiture Verdict (Doc. No. 325) is denied.

## VI.   MOTION FOR NEW TRIAL

Defendant moves for a new trial as to Counts One through Nineteen and Twenty-One through Twenty-Seven because the interests of justice so require.  Given the Court's findings in the preceding pages, the Court disagrees.  The motion for new trial (Doc. No. 326) is denied.

## VII.   CONCLUSION

During the four-week trial on this matter, the government presented a tremendous amount of testimonial and documentary evidence designed to show that Defendant had engaged in a complicated web of transactions, which it argued was the basis for criminal liability for bank fraud, wire fraud, bankruptcy fraud, and money laundering.  In his motions, the Defendant offers a variety of inferences that can be drawn from the government's presentation, all of which he claims points to his innocence.  While this may be, another set of inferences may also be drawn from the government's presentation, all of which point to his guilt.  Where the record as a whole is sufficient to support a jury's findings that every element of the charged crimes has been met, a Court must not disturb those findings.

The Defendant's Motions are denied.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES, | : | CRIMINAL ACTION |
|     Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | |
| GENE BORTNICK, | : | NO. 03-CR-0414 |
|     Defendant. | : | |

<u>ORDER</u>

AND NOW, this   20th   day of July, 2005, presently before the Court are the following post-trial motions filed by Defendant Gene Bortnick: the Renewed Motion to Dismiss Count One of the Indictment for Failure to State a Criminal Offense Pursuant to Federal Rule of Criminal Procedure 12(b) and, in the Alternative, for Judgment of Acquittal on Count One Pursuant to Federal Rule of Criminal Procedure 29(a-c) due to the Government's Failure to Allege or Prove that Alleged Bank Fraud Victim was FDIC Insured (Doc. No. 312); the Renewed Motion for Judgment of Acquittal on Counts Two Through Eighteen Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 308); the Renewed Motion for Judgment of Acquittal on Counts One through Eighteen Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 324); the Renewed Motion for Judgment of Acquittal on Counts Twenty-Six and Twenty-Seven Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 323); the Renewed Motion for Judgment of Acquittal as to Count Nineteen Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 318); the Renewed Motion for Judgment of Acquittal as to Count Twenty-One Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 319); the Renewed Motion for Judgment of Acquittal as to Count Twenty-Two Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 322); the Renewed Motion for Judgment of Acquittal as to Count Twenty-Three Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 320); the Renewed Motion for Judgment of Acquittal as to Count Twenty-Four (Doc. No. 321); the Renewed Motion for Judgment of Acquittal as to Count Twenty-Five Pursuant to Federal Rule of Criminal Procedure 29(a-c) (Doc. No. 317); the Motion for Acquittal on Forfeiture Verdict Pursuant to Federal Rule of Criminal Procedure 29(c) (Doc. No. 325); and the Motion for New Trial Pursuant to Federal Rules of Criminal Procedure 29(a-d) and 33 (Doc. No. 326).

It is hereby ORDERED that Defendant's Motions are DENIED.

BY THE COURT:

_____
Legrome D. Davis, J.