IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES, | : | CRIMINAL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GENE BORTNICK, | : | NO. 03-CR-0414 |
| Defendant. | : | |

MEMORANDUM

LEGROME D. DAVIS, J.                                                      MARCH 15, 2006

On February 15, 2006, this Court sentenced the defendant to seven days in custody,

followed by five years of supervised release.[1]  Defendant was ordered to pay restitution in the

amount of $7,283,100, a punitive fine of $1,000,000 and a special assessment of $2,600.

Although the Court set forth the rationale for its decisions on the record, this memorandum will

provide a more thorough explanation of the Court's reasoning.

Defendant was the president and 25% owner of three companies – MGL Apparel,

Lorianna Stores ("Lorianna") and MGL Corporation ("MGL").  Through these businesses,

Defendant produced and sold ladies' professional apparel.  In September of 1998, defendant

secured $13 million in asset-based financing from Congress Financial Corporation ("Congress")

with the intent to use the line of credit to aggressively expand the business operations.

According to the Loan Agreement between defendant and Congress, the asset underlying the loan

was the inventory of MGL Apparel, Lorianna and MGL.  The criminal charges brought against

defendant all stem from his activities after the receipt of this initial $13 million in financing.

---

[1] A sentencing hearing was held on February 14-15, 2006.

1

The Third Superceding Indictment ("Indictment") delineated an overarching scheme of fraud designed to increase the amount of financing extended to defendant and his companies. See generally, Third Superceding Indictment dated 12/2/04 (Doc. No. 124).  Under the Loan Agreement, defendant was required to periodically report to Congress the inventory held by this three companies that was eligible to serve as a basis for the loan.  In order to satisfy the reporting requirements, defendant submitted Inventory Certification Reports ("IRCs"), which detailed the total amount of inventory held by the borrowing companies for a given period.  Defendant deliberately overstated the amount of inventory held by his companies on the seventeen IRCs that he submitted to Congress from December 31, 1998 until December 20, 1999.  The scheme to defraud not only included the submission of the false IRCs, but also the misleading of auditors and other third-parties working at the behest of Congress to determine the true state of the companies' finances, the submission of fraudulent bankruptcy filings on behalf of his three companies, the formation of three new, corresponding companies to replace the bankrupted entities, and the concealment of assets and inventory of the three bankrupted companies to entities related and unrelated to defendant.

After a four week trial and a week of deliberations, a jury convicted defendant of one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Count One), seventeen counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two through Eighteen), and two counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2 (Counts Twenty-Six and Twenty Seven).[2]  In addition, the jury found defendant guilty of one count of transferring or

---

[2] While the basis for the bank fraud conviction was the overarching scheme of fraud described above, the basis for the wire fraud charges was the seventeen individual IRCs faxed to Congress from December of 1998 until December of 1999, which the government argued contained fraudulently inflated inventory amounts for the three companies.  The money

concealing property in anticipation of bankruptcy in violation of 18 U.S.C. §§ 152(7) and 2 (Count Nineteen), four counts of making a false claim in bankruptcy in violation of 18 U.S.C. §§ 152(3) and 2 (Counts Twenty-One through Twenty-Four), and one count of concealing the property of a debtor in violation of 18 U.S.C. §§ 152(1) and 2 (Count Twenty-Five).

I.     THE COOPER DECISION

In determining a defendant's sentence, the district court must give meaningful consideration to the factors contained in 18 U.S.C. § 3553(a). United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006).  The relevant factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ....

Id. (citing 18 U.S.C. § 3553(a)).  Since the guidelines provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct, this Court will begin by determining the appropriate guideline range. See Cooper, 437 F.3d at 331.  The Court will then examine the other § 3553(a) factors.

----

laundering charges stemmed from defendant's alleged use of the loan proceeds to purchase a house in Hollywood, Florida.

II.     SENTENCING GUIDELINES

        The government and defendant agree that the United States Sentencing Commission

Guideline calls for a base offense level of 6.[3]  In the Pre-sentence Investigation Report ("PSR"),

the probation officer recommended enhancements to the base offense level because (1) the

amount of loss was between $10,000,000 and $20,000,000, (2) the offense involved more than

minimal planning, (3) a substantial portion of the offense was committed outside the United

States and the offense involved sophisticated means, (4) the offense affected a financial

institution and defendant derived more than $1,000,000, and (5) defendant was the leader and

organizer of an offense which was otherwise extensive.  PSR ¶¶ 36-37, 39-40, 42.  Each of the

recommended enhancements will be addressed in turn.

A.      Calculation of Loss

        The probation officer recommended an enhancement of 15 pursuant to U.S.S.G. §

2F1.1(b)(1)(P) based on his calculation that the loss to Congress was $17,500,000.  PSR ¶¶ 34,

36.  At the time of the bankruptcy filing, Congress had extended approximately $22,000,000 to

defendant's corporations.[4]  Id. ¶ 34.  Congress recouped approximately $4,500,000 from the

collateral pledged as security for the loan. Id.  The probation officer subtracted the recouped

amount from the amount extended to defendant's companies to determine the loss amount,

$17,500,000. Id.  Defendant objects to the probation officer's calculation of loss.[5]

_____

        [3] Since U.S.S.G. § 3D1.3 directs the use of the guideline that yields the greatest offense
level, the guideline for bank fraud is utilized. See Presentence Investigation Report ¶¶ 30, 31.

        [4] The actual figure is $21,991,126.

        [5] Defendant argues that the collateral pledged to secure the loan was valued at $32
million.  Def's Resp. to Gov. Sentencing Brief at 6.  Defendant concludes that no loss is
attributable to defendant since Congress had the ability to, but chose not to, recover its losses

4

Section 2F1.1(b)(1) provides for enhancements based on the amount of loss.  The loss is the value of the money, property, or services unlawfully taken.[6]  U.S.S.G. § 2F1.1 cmt. 8.  The actual loss determination must be predicated on the harm caused by defendant's offenses. United States v. Yeaman, 194 F.3d 442, 456 (3d Cir. 1999) (quoting United States v. Evans, 155 F.3d 245, 253 (3d Cir. 1998)).  Prior to December 31, 1998, MGL had received approximately $12.8 million pursuant to the Loan Agreement with Congress. Def's Resp. to Gov. Sentencing Brief at 9 n.6 (citing Gov. Ex. CF-23).  The first overstated IRC was submitted on December 31, 1998.  Therefore, the $12.8 million received before this date was not unlawfully taken from Congress.  Subtracting $12,800,000 from the total amount of the loan, $21,991,126, results in the total amount of the loan related to the harm caused by defendant's offenses, $9,191,126. See Yeaman, 194 F.3d at 460 (noting that the government must prove a causal nexus).

Congress recovered $4,500,000 from the collateral pledged as security for the loan. Prorating the recovered collateral to reflect the portion of the loan at issue results in a recovered collateral value of $1,908,026.  Subtracting the prorated collateral recovered from the loan amount related to defendant's criminality, results in the actual loss incurred by Congress as a result of defendant's fraudulent actions, $7,283,100. See United States v. Dickler, 64 F.3d 818, 825-26 (3d Cir. 1995) (noting that the victim's loss will be offset by the value received). Pursuant to § 2 F1.1(b)(1), an enhancement of 14 is warranted.

through the collateral provided. Id. at 6-7.  Defendant also argues that a $1.1 million civil settlement agreement between defendant and Congress limits the amount of loss to $1.1 million. Id. at 10-12 (citing United States v. Gallegos, 975 F.2d 710 (10th Cir. 1992)). This Court does not credit either argument.

[6] When the intended loss is greater than the actual loss, the intended loss is to be used. U.S.S.G. § 2F1.1 cmt 8.  In the instant matter, defendant genuinely expected to repay the loan so the actual loss is greater than the intended loss.

B.      More than Minimal Planning

Section 2F1.1(b)(2)(A) of the Guidelines permits the district court to increase the

defendant's offense level by two levels based on a finding that the offense involved more than

minimal planning.  In the instant matter, the offense involved repeated acts over a period of

time.  See 2B1.1 cmt. 1(f) (noting that "more than minimal planning" is deemed present in any

case involving repeated acts over a period of time).  Therefore, this offense involved more than

minimal planning, and an enhancement of 2 is warranted pursuant to U.S.S.G. § 2F1.1(b)(2)(A).

C.      Sophisticated Means

Section 2F1.1(b)(5) of the Guidelines permits the district court to increase the

defendant's offense level by two levels based on a finding that a substantial part of a fraudulent

scheme was committed from outside the United States or a finding that the offense otherwise

involved sophisticated means.  "Sophisticated means" means especially complex or especially

intricate offense conduct pertaining to the execution or concealment of an offense.  U.S.S.G.

§ 2F1.1 cmt 15.  In the instant matter, defendant's scheme to defraud included the submission of

seventeen false ICRs, the misleading of auditors and other third-parties about the true state of

the companies' finances, the submission of fraudulent bankruptcy filings, the formation of three

new companies to replace the bankrupted companies, and the concealment of assets and

inventory of the three bankrupted companies.  This Court concludes that the offense involved

sophisticated means.  As a result, an enhancement of 2 is warranted pursuant to U.S.S.G. §

2F1.1(b)(5)(C).[7]

D.      Derived More than $1,000,000 in Gross Receipts

---

[7] The Court did not need to decide whether § 2F1.1(b)(5)(B) applied.

Section 2F1.1(b)(7)(B) of the Guidelines permits the district court to increase the defendant's offense level by four levels based on a finding that the offense affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense. In order to qualify for this enhancement, the gross receipts to the defendant individually, rather than to all participants, must exceed $1,000,000. U.S.S.G. § 2F1.1 cmt 18. "Gross receipts" include all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of the offense. Id.

The government argues that when the MGL wages and distributions received by defendant ($553,000), the MGL wages and distributions received by defendant's wife ($265,000), and the assets and money that were sent to Fabric and Garments International ($235,000), a company that was 65% owned by defendant, are combined, the sum exceeds $1,000,000. Gov. Sentencing Memo. at 30-31. The MGL wages and distributions paid to defendant's wife for her services at MGL are not attributable to defendant. In addition, the government has not established that defendant indirectly received the assets and money sent to FGI. See United States v. Bennett, 151 F.3d 171, 193 (3d Cir. 1998) (finding that defendant indirectly received $4 million that was transferred to businesses in which he owned a 100% interest); United States v. Wong, 3 F.3d 667, 672-73 (3d Cir. 1993) (finding that defendant was the indirect beneficiary of funds transferred to a company when the company extended him a $300,000 promissory note). The remaining amount, $553,000, does not exceed $1 million so the enhancement does not apply.[8]

---

[8] Defendant argues that not all of this amount stems from gross receipts from the offense as $170,000 was received in salary from MGL during 1998, prior to any incident of offense conduct. Def's Resp. to Gov. Sentencing Brief at 19 n. 12. This Court need not address this argument since defendant's gross receipts from the offense are less than $1 million regardless.

In the alternative, the government argues that the requirements of the enhancement are met if "gross receipts" includes assets received by corporations over which the defendant has de facto control. Gov. Sentencing Memo. at 31-32.  UNICOM Chemical Corporation, which the government argues that defendant controlled "de facto," received $1,090,000 worth of fabric through fraudulent transfers in anticipation of bankruptcy. Id. at 31. In addition, defendant was the President and 25% owner of each of three financed companies, MGL, MGL Apparel and Lorianna, which received multiple millions of dollars. Id. at 32.  The government has not established that defendant individually obtained, directly or indirectly, any part of the $1,090,000 in assets received by UNICOM, a company in which defendant owned no interest, or the multiple millions of dollars received by MGL, MGL Apparel and Lorianna.

Therefore, this Court concludes that defendant did not derive more than $1,000,000 in gross receipts from the offense.  As a result, the enhancement under U.S.S.G. § 2F1.1(b)(7)(B) does not apply.

E.      Role in Offense

Section 3B1.1(a) of the Guidelines permits the district court to increase the defendant's offense level by four levels based on a finding that the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  A participant is defined as a person who is criminally responsible for the commission of the offense. U.S.S.G. § 3B1.1 cmt 2.  Section 3B1.1 is intended to apply to criminal activity engaged in by more than one participant. United States v. Belletiere, 971 F.3d 961, 969 (3d Cir. 1992); see also United States v. Bennett, 161 F.3d 171, 194 n.14 (3d Cir. 1998) (noting that when the court finds that defendant's scheme involved one other criminal participant the court

may consider the use of unwitting outsiders in determining if a criminal enterprise is extensive). Since the government has not provided evidence that this scheme involved another culpable participant, the enhancement under U.S.S.G. § 3B1.1 does not apply.

F.     Total Offense Level

The resulting total offense level is 24.  The corresponding sentence for a defendant with a criminal history of 1 is a sentence of 51 to 63 months.

III.     DOWNWARD DEPARTURE

A.     Extraordinary Family Circumstances

A district court has discretion to grant a downward departure when family circumstances lie outside the parameters of what is ordinary and when the departure would not conflict with the purposes underlying sentencing. United States v. Dominguez, 296 F.3d 192 (3d Cir. 2002). The circumstances of the case must simply place it outside the ordinary; there is no requirement that family circumstances be "truly extraordinary." Id. at 195; see also United States v. Sweeting, 213 F.3d 95, 102 (3d Cir. 2000) (holding that generic concerns regarding the breaking up of families is not enough).

1.     Nathan Bortnick

On October 21, 2005, defendant's unborn baby boy was diagnosed with hypoplastic left heart syndrome ("HLHS"), a rare, complex and potentially fatal congenital heart defect. Children with HLHS are born with a severely underdeveloped left ventricle of the heart. 2/14/06 Tr. at 87.  The preferred treatment for HLHS is a series of three primary surgical procedures conducted during the first five years of the child's life.[9] Id. at 88.  The first surgery

_____

[9] Intermediate catheterizations are also required. Id. at 102-03.

9

takes place when the child is about a week old.  During this procedure, the blood is rerouted, allowing the right ventricle to pump blood to both the lungs and the body.  Id. at 88.  At three to six months of age, a second surgery is performed; the third surgery is performed at two to five years of age. Id. at 88, 122.  The second and third surgeries create a connection between the veins and the pulmonary artery, redirecting the blood flow into a normal pattern.[10] Id. at 88, 123.

Children with HLHS need to be constantly monitored. Id. at 93-94.  Parents are instrumental in caring for these children, as a tremendous amount of surveillance is required. Id. at 93-96, 110, 136.  While these children are not at a greater risk for infection, the consequences of infection could be much more severe for a child who has HLHS than a child without HLHS. Id. at 124, 138; see also id. at 93 (noting that a simple cold could be devastating to an HLHS child's circulation).  Parents must be diligent in informing doctors about small changes in the child. Id. at 93-94 (noting that a change in blueness, a little dehydration, a little cold, eating habits and weight are important factors to evaluate).

Nathan Bortnick was born on November 14, 2005.  His first surgical procedure was a success, and Nathan is doing quite well. Id. at 91.  Nathan's second surgical procedure is expected to occur in a couple of months. Id.  Nathan requires the careful, constant monitoring that all HLHS children do.  While Hannah Bortnick, defendant's wife and Nathan's mother, shares the task of monitoring Nathan with defendant, it is indisputable that defendant's contribution to Nathan's care is extremely important.  In addition to his shared monitoring responsibilities, defendant is responsible for the family's economic stability.  The family is financially dependant on defendant.  Defendant's economic contribution is particularly

_____

[10] The surgeries offer a palliative solution, rather than a curative one. Id. at 123.

important in light of Nathan's heart defect, as it is essential to keep insurance payments timely so that Nathan's coverage is not dropped.

There is no question that defendant's family circumstances lie outside the parameters of what is ordinary. <u>Dominguez</u>, 296 F.3d at 194-195 (finding extraordinary circumstances when a defendant resided with elderly parents who were physically and financially dependant upon her).

2.      Underlying Purposes of Sentencing

A district court must consider the impact of a defendant's family circumstances on the purposes underlying sentencing, i.e. deterrence, incapacitation, just punishment and rehabilitation. <u>Dominguez</u>, 296 F.3d at 198-99.  The traditional purposes of sentencing should be satisfied by the ultimate sentence. <u>Id</u>. at 198.  In the instant matter, this Court does not believe that taking defendant out of his family environment for a protracted period of time will serve a useful social or penal purpose.  Defendant's contribution to the care of Nathan and to his family's financial circumstances is crucial.  Defendant has no criminal history, he is a non-violent offender, and he is not a threat to the community.  The victims of the offense are better served by a sentence involving a shorter period of incarceration.  Defendant owes a substantial amount of restitution, which he will be able to pay more easily if he is not subjected to a lengthy incarceration period.  Seven days incarceration, five years of supervised release, restitution in the amount of $7,283,100 and a punitive fine of $1,000,000 provide an appropriate punitive aspect to the sentence.  This Court believes that the traditional purposes of sentencing are satisfied by the sentence imposed in this case.

B.      Charitable Acts

The sentencing guidelines discourage departures for good works; only when the

charitable works are exceptional can they serve as a basis for departure. United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005). In the instant matter, defendant's charitable acts are far beyond the realm of that traditionally seen. Dozens of letters were submitted to the court demonstrating defendant's charitable acts. 2/15/06 Tr. at 153. One example of such an act was described at the sentencing hearing.

Elena Klatchkova testified at defendant's sentencing hearing. 2/14/06 Tr. at 148-56. Ms. Klatchkova's grandmother worked at one of defendant's factories in Russia. In 1992, when defendant was 22 years old, Ms. Klatchkova gave birth to a child with a heart defect, a child who needed surgery that could not be performed in Russia. When defendant learned of Ms. Klatchkova's situation through his employee, her grandmother, he offered to help. He sat in the office of a top surgeon in Philadelphia until he convinced the surgeon to operate on the baby. He arranged for Ms. Klatchkova and her child to come to the United States and stay with him and his family. Defendant interpreted for Ms. Klatchkova at the hospital and spent nearly all his time with her. After the child recovered from the two surgeries, the child and Ms. Klatchkova returned to Russia. Complications arose and defendant again arranged for Ms. Klatchkova and her child to come to the United States. He broke the news to her when her child passed away. Defendant, a young entrepreneur, spent $100,000 and countless hours with Ms. Klatchkova and her child during this time.[11] Ms. Klatchkova, to this day, does not know how the medical treatment was financed. 2/14/06 Tr. at 156.

This Court finds that this charitable act, by itself, is enough to justify a downward departure under Cooper. However, this act was not an isolated incident. The letters submitted

---

[11] When asked why he helped Ms. Klatchkova, a woman he did not know, defendant responded that if he had the ability to help, why wouldn't he? 2/15/06 Tr. at 139.

by defendant describe defendant's history of helping those who need it most.  This Court finds that defendant's charitable actions are exceptional and warrant consideration when imposing sentence.

## IV.    OTHER § 3553(a) FACTORS

Meaningful consideration must be given to the other § 3553(a) factors when imposing sentence on defendant. Cooper, 437 F.3d at 329.  In considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court notes that the loan agreement started as a business deal that each party wanted to succeed.  Although the ultimate outcome had multiple causes, defendant committed the criminality.  At some point, defendant crossed the line that separates that which is legal from that which is illegal.  Defendant does not have a criminal history, rather, he has a strong, positive history.  He has repeatedly helped people who have had traumatic events in their personal lives.  He helps them simply because he believes it is the right thing to do.

A sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. See 18 U.S.C. § 3553(a)(2)(A).  There is no doubt that defendant was convicted of serious crimes.  As a result of defendant's fraudulent actions, millions of dollars were lost.  The bankruptcy charges are particularly serious.  In order to address the seriousness of the offense, a punitive element to the sentence is required.  This Court believes that a $1,000,000 punitive fine, in addition to the $7,283,100 in restitution, reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the defendant's offenses, while allowing defendant to be where he is so desperately needed, at home with his child.

13

A sentence must also deter criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B), (C).  This Court does not believe that defendant will ever do anything intentionally that will cause him to return to a court of law.

V.       CONCLUSION

Defendant is sentenced to seven days in custody, followed by five years of supervised release.  Defendant is ordered to pay restitution in the amount of $7,283,100, a punitive fine of $1,000,000 and a special assessment of $2,600.

BY THE COURT:

/S/LEGROME D. DAVIS

Legrome D. Davis, J.